# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SYLAS BUTLER, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>JIMMY JOHN'S FRANCHISE, LLC, a Delaware limited liability company; JIMMY JOHN'S ENTERPRISES, LLC, a Delaware limited liability company; JIMMY JOHN'S LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.:<br><br>Jury Trial Demanded |

# CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Nature of the Action** ........ **1**

**The Parties** ........ **6**
Plaintiff ........ 6
Defendants ........ 7
Co-Conspirators ........ 8

**Jurisdiction and Venue** ........ **8**

**Facts Common to All Claims** ........ **9**
The Jimmy John's System ........ 10
Jimmy John's Franchisees: Independent Restaurant Owners Competing With One Another . 12
The Agreement Not to Compete for Employees ........ 16
Other Evidence of Jimmy John's System-Wide Commitment to Suppressing Employee Wages and Mobility and of the Unlawful Agreement ........ 28
Employment with Non-Jimmy John's Brands is Not a Reasonable Substitute for Jimmy John's Employees ........ 33

**Representative Plaintiff Allegations** ........ **34**
Plaintiff Sylas Butler ........ 34
Antitrust Injury ........ 34

**Class Allegations** ........ **35**

**Claims for Relief** ........ **38**
*Count I* ........ *38*
Violations of Sherman Act Section 1, 15 U.S.C. § 1, *et seq* ........ 38
*Count II* ........ *40*
Violations of the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.* ........ 40
*Count III* ........ *42*
Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq* ........ 42

**Prayer for Relief** ........ **45**

**Jury Demand** ........ **47**

Plaintiff Sylas Butler, on behalf of himself and all others similarly situated, with knowledge as to his own actions and events, and upon information and belief as to all other matters, alleges as follows:

## NATURE OF THE ACTION

1. This action challenges under Section 1 of the Sherman Act (and other state laws) an employee non-solicitation and no-hire agreement orchestrated by Defendants Jimmy John's Franchise, LLC, Jimmy John's Enterprises, LLC, Jimmy John's LLC (together, "Defendants" or "Jimmy John's") between and among Jimmy John's restaurant franchisees, pursuant to which the franchisees agreed not to solicit, recruit, or hire each other's employees. Jimmy John's, at its principal place of business located in Illinois, orchestrated, designed, monitored, and enforced this anti-competitive contract, combination, or conspiracy. Jimmy John's orchestrated, dispersed, and enforced the agreement among all franchisees, at least in part, through explicit contractual agreements (and remedies for violation) contained in standard Jimmy John's franchise documents and in forms used by franchisees. The practice at issue reflects a naked restraint of competition and a per se violation of the antitrust laws.

2. Jimmy John's is a sandwich restaurant chain with over 2,700 locations in more than 40 states plus the District of Columbia. Approximately Ninety-eight percent of Jimmy John's restaurants are franchise businesses that are independently owned and operated as separate and distinct entities from Jimmy John's.

3. Plaintiffs are current and former employees of Jimmy John's franchise restaurants. Plaintiffs suffered reduced wages and benefits and diminished employment opportunities as a result of the unlawful contract, combination, or conspiracy alleged herein.

4. Jimmy John's designates a portion of its corporate website to franchising information. In describing its franchise brand, Jimmy John's states that "[w]e've been committed

to making the world's greatest gourmet sandwiches since day one and that's not about to change."[1] Jimmy John's proclaims "[l]oyalty to people, community and building America" and boasts that it "create[s] about 210 new jobs per week."[2]

5. As part of its system to maintain its significant competitive advantage, Jimmy John's franchisees, at the direction of and with the assistance of Jimmy John's itself, have together colluded to suppress the wages and employment opportunities of the restaurant-based employees who work at Jimmy John's franchise locations throughout the United States.

6. In particular, beginning no later than 2012 (and likely back to at least 2007), Jimmy John's franchisees contracted, combined, and/or conspired to neither:

> recruit as a partner or investor/owner, or hire as an employee, any person then employed, or who was employed within the immediately preceding twelve (12) months, by [Jimmy John's], any of [of Jimmy John's] affiliates, or a franchisee – or who is still bound (even if it has been more than 12 months) by a restrictive covenant in an agreement with [Jimmy John's], any of [Jimmy John's] affiliates, or a franchisee – without obtaining the existing or former employer's prior written permission and giving [Jimmy John's] a copy.

7. Franchisees further agreed:

> to restrict [their] own employees, as a condition of their employment with [franchisees], from becoming a partner of or investor/owner with, or working for, another Jimmy John's franchisee for at least twelve (12) months after they leave [the franchisee's] employment and to advise them that other Jimmy John's franchisees are contractually prohibited by [Jimmy John's] from recruiting them as partners or investors/owners, or from hiring them, for at least twelve (12) months after they leave your employment (regardless of the reason for their departure).

8. Each franchisee agreed that other franchisees would be "third party beneficiaries" of these provisions, with independent rights of enforcement. Each franchisee also agreed to

---

1 Available https://www.jimmyjohns.com/franchising/why-franchise/ (last visited January 18, 2018).

2 Available at https://www.jimmyjohns.com/about-us/our-sustainability/ (last visited January 18, 2018).

onerous remedies for any violation of these provisions: in addition to "other rights and remedies" available, franchisees agreed to pay to Jimmy John's or the affected franchisee Fifty Thousand Dollars ($50,000) for a violation of these provisions. Franchisees also agreed that Jimmy John's could terminate a franchisee's franchise agreement entirely for a violation of the agreements set out in Paragraphs 6 and 7, above.

9. The no-hire agreement as evidenced by the above was orchestrated by Jimmy John's but, by its terms and according to Jimmy John's own understanding, was an agreement between and among the independently owned and operated franchisees.

10. Franchisees further evidenced their agreement by utilizing and entering into form "agreements" with their own employees, which set out purported terms of employee "confidentiality" and/or "non-competition" (hereafter, "Employee Non-Competition Agreements"). The form Employee Non-Competition Agreements were prepared by Jimmy John's and used system-wide, even with low-wage and hourly employees such as cash register clerks and delivery drivers. In the Employee Non-Competition Agreements, franchisees admitted to restaurant employees that other Jimmy John's franchisees were "contractually prohibited by [Jimmy John's] from recruiting Employee as a partner or investor/owner, or from hiring Employee, for at least twelve (12) months after Employee leaves his or her employment with Employer (regardless of the reason for his or her departure)."

11. The no-hire agreement that franchisees admitted to in the Employee Non-Competition Agreements was consistent with franchisees' agreement to restrict their own employees, as described in Paragraph 7, above. It was also consistent with a provision of the franchise agreement by which franchisees agreed to obtain non-competition covenants from the personnel Jimmy John's specified. Franchisees specifically agreed that Jimmy John's had "the

right to regulate the form of the [non-competition] agreement" and "to be a third party beneficiary of that agreement with independent enforcement rights." By orchestrating use of the Employee Non-Competition Agreements it created and dispersed to franchisees, Jimmy John's did exactly that.

12. Franchisees entering into new franchise agreements beginning in 2015 evidenced the no-hire agreement by expressly pledging to refrain from "solicit[ing] or initiat[ing] recruitment" of any employee (or person employed in the preceding twelve months) of Jimmy John's, any of its affiliates, or another franchisee. Jimmy John's and franchisees did not cancel the Employee Non-Competition agreements, and the non-solicit and non-recruitment agreement expressly extended as well to any person bound by such an agreement. Franchisees continued to specify and agree that, as a condition of employment, *managers* would remain subject to the already-existing outright no-hire agreement. Franchisees agreed to inform managers that other Jimmy John's franchisees remained "contractually prohibited" from recruiting or hiring them during their employment and for a 12-month period afterwards. Franchisees continued to agree to a $50,000 remedy for violation of these agreements (along with potential franchise termination), and that affected franchisees were "third party beneficiaries" of the agreement, with independent rights of enforcement.

13. Franchisees entering into new franchise agreements in 2016 and 2017 evidenced the agreement in a similar manner. While they no longer reduced to writing (at least not in the franchise agreement) their express agreement to restrict restaurant managers from employment with another franchise, or to advise their managers that other franchisees were "contractually prohibited" from hiring them, a violation of the non-solicitation and non-recruitment agreement remains expressly against pain of monetary punishment and/or termination of the franchisee's

franchise. Franchisees under 2016 and 2017 franchise agreements agreed that a franchisee's violation of the agreement as to a person employed in a management position at another Jimmy John's restaurant continues to subject the franchisee to a $50,000 remedy (now purportedly as "liquidated damages"). They also agreed that Jimmy John's or any franchisee employer would be entitled to recover attorneys' fees and costs incurred in an action brought to enforce the agreement.

14. The $50,000 remedy for violations of the franchisee no-hire agreement is an amount greater than 140 percent of the 2017 Jimmy John's initial franchise fee. As discussed further below, the franchise agreement also allows Jimmy John's to impose upon a franchise owner up to three years' worth of restaurant royalties as "liquidated damages" in the event the franchise is terminated.

15. Under every version of the Jimmy John's franchise agreement, franchisees have expressly agreed that each other Jimmy John's franchisee is a third-party beneficiary of their commitments. And, as the orchestrator of the agreement, Jimmy John's has itself admitted and taken the litigation position in a separate lawsuit that the no-hire agreement evidenced by the non-solicitation and non-recruitment understanding constitutes an agreement "created between franchisees."

16. The Jimmy John's no-hire agreement is an unreasonable restraint of trade.

17. As the Department of Justice (DOJ) Antitrust Division and Federal Trade Commission's joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."[3] The

---

[3] Available at https://www.justice.gov/atr/file/903511/download (last visited January 18,

DOJ/FTC *Guidance* elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[4]

18. The no-hire agreement between and among Jimmy John's franchisees eliminated franchisees' incentives and ability to compete for employees, and restricted employees' mobility. Far from "creating jobs," this agreement instead harmed employees by lowering salaries and benefits employees otherwise would have commanded in a competitive marketplace, and deprived employees of better job growth opportunities.

19. The agreement between and among Jimmy John's franchisees is a naked restraint of trade that is per se unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1. As the orchestrator of the unlawful agreement, Jimmy John's bears per se liability therefor.

## THE PARTIES

**Plaintiff**

20. Plaintiff Sylas Butler is a resident of Madison County, Illinois. From approximately August 2015 until approximately January 2017, he was an employee of KIDDS RESTAURANTS, INC., which owns and operates the Jimmy John's franchise store located at 1063 S. State Road 157, Edwardsville, Illinois 62025.

21. Plaintiff Butler worked part-time at Jimmy John's. He worked both as a delivery driver, at a rate of $5.50 per hour plus 50 cents per mile, and as an in-store employee, at the Illinois minimum wage rate of $8.25 per hour. In January 2017, Butler quit this job after his supervising manager had reduced his hours to approximately four hours per week. Plaintiff

---

2018).

4 *Id.*

Butler suffered reduced wages and inhibited employment opportunities due to the Jimmy John's no-hire agreement.

**Defendants**

22. Jimmy John's restaurants are in the business of selling food, specifically sandwiches, to customers, primarily through independently owned and operated franchise stores. Approximately 98% of Jimmy John's restaurants are independently owned and operated franchise stores. These stores exist in over 2,700 locations throughout the United States.

23. Defendant Jimmy John's Franchise, LLC, is a Delaware limited liability company with its principal place of business in Illinois. Jimmy John's Franchise, LLC is the franchisor of the Jimmy John's system. It enters into franchise agreements with independent franchise owners, allowing those franchisees to make use of the Jimmy John's system in their independent franchise businesses.

24. Defendant Jimmy John's Enterprises, LLC is a Delaware limited liability company with its principal place of business in Illinois. It owns the trademarks, service marks, commercial symbols, and certain other intellectual property associated with the Jimmy John's brand and licensed to Jimmy John's franchisees. Jimmy John's Enterprises, LLC owns and operates Jimmy John's corporate-owned stores and creates and develops the standards and specifications for Jimmy John's "Trade Secret Food Products and Branded Products."

25. Defendant Jimmy John's LLC is a Delaware limited liability company with its principal place of business in Illinois. It is the parent, or holding, company of Defendants Jimmy John's Franchise, LLC, and Jimmy John's Enterprises, LLC.

26. Defendants Jimmy John's Franchise, LLC, Jimmy John's Enterprises, LLC, and Jimmy John's LLC, are referred to together herein as "Jimmy John's."

27. Plaintiff is ignorant of the true names and capacities, whether individual,

corporate, or associate, of those defendants fictitiously sued as DOES 1 through 10 inclusive and so Plaintiff sues them by these fictitious names. Plaintiff is informed and believes that the DOE defendants 1 through 10 reside in the State of Illinois and/or other states, and are all in some manner responsible for the conduct alleged herein. Upon discovering their true names and capacities, Plaintiff will amend this Complaint to show the true names and capacities of these fictitiously named defendants.

**Co-Conspirators**

28. Various other corporations and persons not made defendants in this Complaint, including Jimmy John's franchisees, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged.

## JURISDICTION AND VENUE

29. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and to enjoin further violations. The Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, under Section 4 of the Sherman Act, 15 U.S.C. § 4, and under 28 U.S.C. §§ 1331, 1332(d), 1337 and 1367 to prevent and restrain the Defendant from violating Section 1 of the Sherman Act, 15 U.S.C. § 1.

30. Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26, and under 28 U.S.C. § 1391(b)(2) and (c)(2). A substantial part of the events that gave rise to this action occurred here. Jimmy John's transacts or has transacted business in this district. Jimmy John's standard franchise agreement states that the provisions and terms of that agreement are to be interpreted in accordance with and governed by the laws of the

state of Illinois, and specifies that all notices are to be directed and delivered to Jimmy John's address at its principal place of business, in the state of Illinois.

31. Jimmy John's is in the business of selling sandwiches to consumers through independently owned and operated franchise stores. These stores are located in approximately forty-six states within the United States (including in Illinois), and Jimmy John's has substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the owner of the franchise. Jimmy John's engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## FACTS COMMON TO ALL CLAIMS

32. The principle of free competition applies to the labor market as well as to trade. "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says Joseph Harrington, Wharton professor of business economics and public policy, in his description of a no-poaching agreement.

33. According to Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, a no-poaching agreement is unfair to employees and such a pact "benefits the companies at the expense of their employees." Mr. Cappelli notes that the reason such agreements are illegal and violate both anti-trust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

34. The collusion of employers to refrain from hiring each other's employees restricts employee mobility. This raises employers' power in the market at the expense of employees and diminishes employee bargaining power. This is especially harmful to employees of Jimmy

John's franchise restaurants as those employees are usually paid below a living wage,[5] and their marketable skills acquired through their work at Jimmy John's primarily have value only to other Jimmy John's restaurants and do not transfer to other fast food restaurants or similar businesses. In addition, widespread use of no-poach agreements within the franchise restaurant industry effectively reduces the number of competitive employers in a market to no more than the number of franchise companies. No-poach agreements have anti-competitive impact in labor markets analogous to that of mergers in product markets.

35. The United States DOJ has pursued and resolved antitrust investigations relating to no-hire agreements among employers. In 2010, a DOJ settlement with six high-tech employers prohibited the companies from engaging in anticompetitive no-solicitation agreements relating to their employees on a going-forward basis. In January 2018, DOJ antitrust chief and Assistant Attorney General Makan Delrahim disclosed that the DOJ Antitrust Division is presently pursuing a number of criminal cases relating to employer no-hire agreements.

**The Jimmy John's System**

36. Jimmy John's is sandwich store chain with over 2,700 locations in more than 40 states plus the District of Columbia. Approximately Ninety-eight percent (98%) of Jimmy John's restaurants are franchise businesses that are independently owned and operated as separate and distinct entities from Jimmy John's. The remaining restaurants are owned and operated by Jimmy John's itself.

37. According to a *Franchise Times* report published in 2017, Roark Capital

---

5 In 2014, the average hourly wage of fast food employees is $9.09 or less than $19,000 per year for a full time worker. The poverty level of a family of four in the U.S. is $23,850. Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack,* CNN Money (May 20, 2014) http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited January 18, 2018).

Management, LLC, a private equity firm, became the new majority owner of Jimmy John's after a $2 billion transaction.[6] Jimmy John's "affiliate" franchise programs under Roark's ownership include the following other restaurant franchise chains: Carvel, Cinnabon, Schlotzsky's, Moe's, Auntie Anne's, McAlister's, Corner Bakery, Arby's Franchisor, LLC, and CKE Inc.

38. Jimmy John's restaurants employ tens of thousands of workers at franchise restaurants in the United States.

39. Jimmy John's franchise restaurants can be located in strip shopping centers, shopping malls, free-standing units, and other venues in downtown commercial areas and in suburban areas. Each franchisee is responsible for locating an appropriate restaurant site, which must be approved by Jimmy John's. The franchisee is required to operate the restaurant at the specific site that Jimmy John's approves, and may not relocate without Jimmy John's approval (and without paying a relocation fee).

40. Most of the company's franchisees are subject to a 10-year franchise agreement. The initial Jimmy John's franchise fee is currently $35,000. Although the form franchise agreement (along with the Franchise Disclosure Document provided to prospective franchisees) is periodically updated, a franchisee remains contractually bound to the particular agreement that it signs—which is to say, a franchisee who signs Jimmy John's 2012 franchise agreement binds itself to that agreement and not to the terms of later agreements.

41. Jimmy John's estimated revenue was $464.1 million for the fiscal year 2016 with over $2 billion in system-wide sales.[7] Jimmy John's revenues come from the royalties (currently

---

[6] Available at http://www.franchisetimes.com/news/March-2017/Jimmy-Johns-Leads-List-of-Franchise-Times-Dealmakers-Winners/ (last visited January 18, 2018).

[7] Available at http://www.prnewswire.com/news-releases/jimmy-johns-sells-majority-stake-to-roark-capital-300324501.html (last visited January 18, 2018).

6% of gross sales) and fees paid by the franchisees, as well as sales in its company-operated restaurants.

42. Under a Jimmy John's franchise agreement, Jimmy John's grants to a franchisee the right to utilize the Jimmy John's brand (including the right to use Jimmy John's trademarks and intellectual property) in the operation of an independently owned and operated franchise store.

43. Like other fast food chains in the industry, Jimmy John's restaurants maintain teams of staff in order to oversee operations and guide entry-level employees through daily responsibilities.

44. Specific job titles falling under the category of "management" may include on-site managers, certified managers, area managers, and various other titles.

45. Wages and salaries for employees of franchised restaurants are not dictated by Jimmy John's, but average pay scales start out at minimum wage or approximately $8.00 per hour for inexperienced employees and eventually rise to roughly $12.00 per hour for highly qualified or tenured managers.

46. Assistant manager positions may yield annual pay options varied by location but usually falling between $20,000 and $30,000.

47. Store managers may begin at $30,000 per year and may receive bonuses, raises or pay increases.

**Jimmy John's Franchisees: Independent Restaurant Owners Competing With One Another**

48. Each franchise is operated by an entity that is a separate legal entity from Jimmy John's. Each franchise is an independently owned and independently managed business.

49. On its Website, Jimmy John's emphasizes that Jimmy John's franchises are

independently owned and operated businesses.[8]

50. Jimmy John's license agreements provide that the franchisees are independent of Jimmy John's and are responsible for all obligations and liabilities of the business, and responsible for the day-to-day operations of the business. Jimmy John's Franchise Disclosure Document ("FDD") and the franchise agreement itself specify that the franchisee is responsible for developing the Jimmy John's restaurant.

51. Pursuant to the Jimmy John's franchise agreement, Jimmy John's and franchisees operate as independent contractors as to each other. The franchise agreement specifically disclaims that Jimmy John's and franchisees are general or special agents, joint venture partners, or employees of the other "for any purpose."

52. Jimmy John's franchise agreement requires the franchisee to identify itself as the restaurant's independent owner, operator, and manager in the manner Jimmy John's prescribes. Franchisees agree to identify themselves "conspicuously in all dealings with customers, suppliers, public officials, restaurant personnel, and others" as the restaurant's "independent owner, operator, and manager" and agree to place notices of independent ownership on the forms, business cards, stationery, advertising, and other materials Jimmy John's requires.

53. Beyond the terms of the franchise agreement itself, franchisee owners must personally initial and assent to certain Jimmy John's "Franchisee Representations." These representations include a further acknowledgement that Jimmy John's and the franchisee are independent contractors as to each other, and that "Nothing is intended to make Franchisee or us a general or special agent, joint venture, partner, or employee of the other for any purpose."

54. Sworn testimony provided (in a different lawsuit) by James North, the President

---

[8] Available at https://www.jimmyjohns.com/contact-us/jobs/ (last visited January 18, 2018).

and Chief Executive Officer of Jimmy John's LLC, Jimmy John's Franchise, LLC, and Jimmy John's Enterprises, LLC, reinforces that franchisees "independently own[] and operate[] a franchise business that stands in an arm's length contractual relationship with Jimmy John's" and that franchisees and Jimmy John's are neither agents, joint venturers, partners, or employees of each other "for any purpose."[9]

55. In the FDD, Jimmy John's tells prospective franchisees that their costs in operation of a Jimmy John's restaurant and their gross sales volume will depend on, among other things, their skill and business acumen, local economic conditions, and the prevailing wage rate for labor and competition.

56. A franchisee's profitability is a function of a number of inputs, including its cost of labor, which Jimmy John's specifically identifies as a franchisee operating expense.

57. Jimmy John's franchise agreement notes that efforts of the franchisee's staff are "vital" to the store's success, and that attracting and retaining customers "will require you to have a high level of customer service."

58. Franchisees are required to enroll present and future managers at Jimmy John's training centers, the travel cost and expense of which is borne by franchisees.

59. Although Jimmy John's requires franchisees to use certain certified managers for a minimum number of shifts each week, it specifically leaves to the franchisee the decision how many such certified managers to employ.

60. Jimmy John's franchise restaurants compete with each other. In the FDD, Jimmy John's notifies prospective franchisees that their restaurant will "compete with other sandwich shop chains (local, regional, and national), restaurants, and food service businesses." Jimmy

---

[9] *See* Declaration of James North, executed August 25, 2015 and filed May 17, 2017, in *In re Jimmy John's Overtime Litig.*, No. 14-cv-05509 (N.D. Ill.), Dkt. No. 539-2 at ¶¶ 6-7.

John's alerts prospective franchisees that they might compete with restaurants or stores operated by its affiliates and their franchisees.

61. Jimmy John's alerts prospective franchisees that Jimmy John's itself may operate Jimmy John's branded restaurants and also reserves the right, on behalf of itself and its affiliates, to establish other franchises, company-owned outlets, or distribution channels selling or leasing similar products and services under a different trademark.

62. A Jimmy John's franchisee has no exclusive, protected, or territorial rights in the contiguous market area of its restaurant location.

63. The FDD tells prospective franchisees "You will not receive an exclusive territory. You also do not have any type of non-exclusive territory. You may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control. We (and our affiliates) retain the right at all times to engage in any and all activities that we (and they) deem appropriate, wherever and whenever we (and they) desire, and whether or not these activities compete with your Restaurant."

64. Jimmy John's specifically reserves the right to establish and operate, or allow others to operate, Jimmy John's restaurants at any location or to enter into other business and distribution channels using the Jimmy John's marks.

65. The FDD further alerts prospective franchisees that they have no "options, rights of first refusal, or similar rights" to acquire additional franchises.

66. The franchise agreement, too, specifies that the franchise is "non-exclusive," and that the franchisee has "no territorial protection whatsoever … and we … retain the right at all times … to engage in any and all activities we … deem appropriate, wherever and whenever we … desire, and whether or not such activities compete with [franchisee's] Restaurant, including,

without limitation, the right to: … establish and operate, and allow others to establish and operate, Jimmy John's Restaurants at any locations and in any areas, other than" at the specific site.

67. In the "Franchisee Representations" to which franchise owners must also personally assent, franchisees agree that they have no "exclusive," "expansion," "protected," "non-encroachable," or other territorial rights, rights of first refusal, or rights of any other kind concerning "the contiguous or any other market area of the Restaurant, or any other existing or potential Jimmy John's Restaurant or geographic territory."

68. Although Jimmy John's stores are required to offer food delivery, the FDD informs prospective franchisees that their delivery area also "is not exclusive" and that Jimmy John's may engage and/or allow other franchisees to engage in deliveries within the same area.

69. The franchise agreement also specifies that the restaurant's delivery area is not exclusive and that Jimmy John's may change a restaurant's delivery area at any time for any or no reason. Franchisees agree that "The delivery area is nothing more than the geographic boundaries in which [the franchisee] may deliver the Restaurant's products. It confers no other rights on [the franchisee] whatsoever."

**The Agreement Not to Compete for Employees**

70. In the FDD, Jimmy John's informs prospective franchisees that it plays no role in franchisees' labor relations or employment practices. The FDD asserts that Jimmy John's has "no control or authority over [franchisee] labor relations, including, among other things, employee selection…." The FDD informs franchisees that they must communicate clearly with restaurant employees that the franchisee is the employer and that Jimmy John's is not the employer. Jimmy John's purports to disclaim responsibility for restaurant labor relations and employment practices no fewer than four times in the FDD.

71. Likewise, in no fewer than *six* provisions in the franchise agreement, franchisees agree that Jimmy John's plays no role in franchisee labor relations or employment practices.

72. For instance, to the extent franchisees use the Jimmy John's marks in employment-related materials, they agree to include a clear disclaimer that Jimmy John's does not engage in franchisee employment-related activities, including "employee selection."

73. Franchisees agree that "Under no circumstances will [Jimmy John's] control the forms or terms of employment agreements [franchisees] choose to use with Restaurant employees or otherwise be responsible for [franchisee] labor relations or employment practices."

74. Franchisees agree that Jimmy John's has "no control or authority over [franchisee] labor relations, including, but not limited to, employee selection, training, promotion, termination, discipline, hours worked, rates of pay, benefits, work assigned, working conditions, or adjustment of grievances and complaints, or any other control over your employment practices."

75. Franchisees agree that Jimmy John's does not "share or codetermine the terms and conditions of employment of Restaurant employees or affect matters relating to the employment relationship between you and Restaurant employees, such as employee selection…." Franchisees agree to identify themselves as Restaurant employees' employers, "and to confirm that [Jimmy John's] [is] not their employer and do[es] not engage in any employer-type activities for which only franchisees are responsible, such as employee selection…."

76. The "Franchisee Representations" initialed by franchisee owners re-affirm the statements in the preceding paragraph.

77. Notwithstanding that they are independently owned and operated businesses that compete with each other, and notwithstanding that they (ostensibly) make their own decisions

concerning "employee selection," Jimmy John's franchisees have agreed not to compete with each other with respect to employee hiring. This agreement is evidenced and memorialized in explicit contractual terms contained in the Jimmy John's franchise agreement and in related documents utilized by franchisees.

78. In particular, franchisees who have executed franchise agreements from 2016 to the present all have agreed that they will not: "solicit or initiate recruitment of any person then employed, or who was employed within the preceding twelve (12) months, by [Jimmy John's], any of [Jimmy John's] affiliates, or another Jimmy John's Restaurant franchisee."

79. The FDD also evidences that franchisees agree to such a policy: "You may not solicit or initiate recruitment of any person then employed, or who was employed within the preceding 12 months, by us, any of our affiliates, or another franchisee." The FDD further evidences franchisees' agreement that "interference with [Jimmy John's] or franchisee's [*sic*] employees" is precluded.

80. Pursuant to the current form of franchise agreement, franchisees agree that violation of the employee solicitation and recruitment restrictions set out above is grounds for Jimmy John's to terminate the franchise. The FDD likewise evidences franchisees' agreement that a violation of the employee recruiting restrictions constitutes a "non-curable default" of the agreement, and qualifies for "with cause" termination of the franchise.

81. In the event Jimmy John's terminates a franchise, franchisees agree that Jimmy John's may require the franchisee to pay, within 15 days, "liquidated damages" in the form of up to three years' worth of restaurant royalties.

82. In the event Jimmy John's, its affiliates, or another Jimmy John's Restaurant franchisee brings successful legal action to enforce the non-solicitation and non-recruitment

provision in the franchise agreement, franchisees agree to pay the attorneys' fees and costs incurred by Jimmy John's, its affiliate, or the other franchisee in doing so.

83. With respect to the hiring of "any person employed in a management position at a Jimmy John's Restaurant" after solicitation or recruitment in violation of the above, the unlawful agreement goes even further. In those circumstances, franchisees also agree to pay to Jimmy John's, its affiliates, or any other Jimmy John's Restaurant franchisee, "liquidated damages" in the amount of $50,000, along with any attorneys' fees and costs incurred in a successful legal action to enforce the provision.

84. Jimmy John's franchisees are subject to the same (or very similar) franchise agreements, depending upon the year the agreement was executed. In agreeing to these terms, all franchisees know that each other franchisee also has agreed to the same (or very similar) terms.

85. Further, franchisees explicitly agree in the franchise agreement that all other current and future Jimmy John's Restaurant franchisees are "third-party beneficiaries" of the non-solicitation and non-recruitment provision.

86. Jimmy John's has admitted in a separate litigation that these provisions discuss "rights created between franchisees…."[10]

87. Even if it were limited to employee "non-solicitation" and "non-recruitment," Jimmy John's franchisees' agreement (as orchestrated by Jimmy John's) would violate the Sherman Act. But the agreement is not and never has been so-limited. In fact, Jimmy John's franchisees' agreement (orchestrated and policed by Jimmy John's) extends and has extended far beyond this, and is evidenced by explicit written commitments demonstrating a broad, outright no-hire agreement.

---

10 *See* Jimmy John's Reply in Support of Motion for Partial Summary Judgment, *In re Jimmy John's Overtime Litig.*, No. 14-cv-05509 (N.D. Ill.), Dkt. No. 589 at p. 10.

88. Going back to 2007 or earlier, Jimmy John's franchisees explicitly agreed not to hire each other's employees and informed their own employees that no other franchisee could hire the employee away for at least twelve months after the employee left the franchisee's employment.

89. Beginning no later than 2012 (and likely going back to at least 2007), Jimmy John's franchisees evidenced their unlawful no-hire contract, combination, and/or conspiracy in the franchise agreement itself. There, they explicitly agreed to neither:

> recruit as a partner or investor/owner, *or hire as an employee*, any person then employed, or who was employed within the immediately preceding twelve (12) months, by [Jimmy John's], any of [of Jimmy John's] affiliates, or a franchisee – or who is still bound (even if it has been more than 12 months) by a restrictive covenant in an agreement with [Jimmy John's], any of [Jimmy John's] affiliates, or a franchisee – without obtaining the existing or former employer's prior written permission and giving [Jimmy John's] a copy.

(Emphasis supplied.)

90. Franchisees further evidenced their no-hire pact by explicitly agreeing:

> to restrict [their] own employees, as a condition of their employment with [franchisees], from becoming a partner of or investor/owner with, *or working for*, another Jimmy John's franchisee for at least twelve (12) months after they leave [the franchisee's] employment and *to advise them that other Jimmy John's franchisees are contractually prohibited* by [Jimmy John's] from recruiting them as partners or investors/owners, or *from hiring them*, for at least twelve (12) months after they leave your employment (regardless of the reason for their departure).

(Emphasis supplied.)

91. As they do still today, each franchisee agreed that other franchisees would be "third party beneficiaries" of these provisions, with independent rights of enforcement. As today, each franchisee also agreed to serious remedies for any violation of these provisions: in addition to "other rights and remedies" available, franchisees agreed to pay to Jimmy John's or the affected franchisee Fifty Thousand Dollars ($50,000) for a violation of these provisions.

Franchisees also agreed that Jimmy John's could terminate a franchisee's franchise agreement entirely for a violation of the agreement.

92. Consistent with their no-hire agreement and with the above evidence of that agreement, and providing additional evidence of the no-hire agreement, franchisees also used and entered into separate form "agreements" with their own employees (previously referred to, and referred to hereafter as, "Employee Non-Competition Agreements").

93. Jimmy John's provides franchisees, either in a proprietary and confidential Operations Manual or otherwise, with guidance on methods and techniques for recruiting and interviewing employees. Jimmy John's provides or provided recommended forms to use for new hires, including store employees. One of these forms is the Employee Non-Competition Agreement, designed by Jimmy John's for use with all store employees, irrespective of the employee's job title or function.

94. The form Employee Non-Competition Agreements were prepared by Jimmy John's and used system-wide, even with at-will, low-wage and hourly employees such as sandwich makers, cash register clerks, and delivery drivers. In the Employee Non-Competition Agreements, franchisees admitted to restaurant employees that other Jimmy John's franchisees were "contractually prohibited by [Jimmy John's] from recruiting Employee as a partner or investor/owner, or from hiring Employee, for at least twelve (12) months after Employee leaves his or her employment with Employer (regardless of the reason for his or her departure)."

95. This admission was consistent with franchisees' agreement to restrict their own employees, "as a condition of their employment," as evidenced in the franchise agreement itself. It was also consistent with a provision of the franchise agreement by which franchisees agreed to obtain non-competition covenants from the personnel Jimmy John's specified. Franchisees

specifically agreed that Jimmy John's had "the right to regulate the form of the [non-competition] agreement" and "to be a third party beneficiary of that agreement with independent enforcement rights." Jimmy John's did so-regulate the Employee Non-Competition Agreements, just as franchisees agreed it could.

96. The Employee Non-Competition Agreements also purport to bar employees from having any direct or indirect interest in, or working at, any other business that sells "submarine, hero-type, deli-style, pita, and/or wrapped or rolled sandwiches," within three miles[11] of *any* Jimmy John's restaurant in the United States, during their employment with Jimmy John's and for two years after.

97. In addition, the Employee Non-Competition Agreements purport to require employees to inform their employer "immediately upon receipt of any employment offers made by any competitor," which would include other Jimmy John's restaurants. The Employee Non-Competition Agreements also purport to require the employee to reimburse both the franchisee employer and Jimmy John's for all costs and expenses, including attorneys' fees, incurred "to enforce this Agreement against Employee." Finally, under the Employee Non-Competition Agreements, employees (purportedly) "recognize" that Jimmy John's is a third-party beneficiary of the agreement, that Jimmy John's may enforce the Employee Non-Competition Agreement "with or without the authorization or cooperation of" the franchisee employer, and that Jimmy John's will suffer irreparable harm from any employee violation of the agreement and thus may apply for injunctive relief with the employee "agreeing" to pay Jimmy John's costs and attorneys' fees.

98. Taken together, the standard franchise agreement for every franchisee who

[11] Jimmy John's changed the geographic area in its form Employee Non-Compete to two miles at some point.

executed a franchise agreement in 2012, 2013, and 2014 (and likely much earlier, as well), along with the Employee Non-Competition Agreements, evidence a sweeping and blatant no-hire agreement among franchisees.

99. Although *some* of the language evidencing their agreement changed for franchisees executing new franchise agreements beginning in 2015, the agreement overall did not. Beginning in 2015, franchisees executing new franchise agreements evidenced their unlawful pact by expressly agreeing to refrain from "solicit[ing] or initiat[ing] recruitment" of other franchisees' employees (including current employees and those employed within the last twelve months).

100. Franchisees specifically agreed, as well, that this would continue to apply to an employee "who is still bound (even if it has been more than 12 months) by a restrictive covenant in an agreement with [Jimmy John's], any of [its] affiliates, or a franchisee" unless the franchisee obtained "the existing or former employer's prior written permission" and supplied Jimmy John's with a copy of that permission. This is to say, Jimmy John's and franchisees did not cancel the Employee Non-Competition Agreements that franchisees agreed to use, and used, with their employees; the non-solicit and non-recruitment agreement expressly extended as well to any person bound by such an "agreement." Indeed, franchisees continued to embrace the Employee Non-Competition Agreements and, for its part, Jimmy John's continued to orchestrate, sanction, and police the broad no-hire agreement.

101. Franchisees also continued to expressly evidence their agreement that *managers* would remain subject to the broad no-hire agreement. Franchisees agreed to "restrict [their] own managers, as a condition of employment … from working for … another Jimmy John's franchisee for at least twelve (12) months after" the manager left their employment. Franchisees

also agreed to inform their own managers that other Jimmy John's franchisees remained "contractually prohibited" from recruiting or hiring them during their employment and for a 12-month period afterwards. All of this continued to be accomplished through the use of Employee Non-Competition Agreements.

102. Franchisees continued to agree to a $50,000 remedy for violation of these agreements (along with potential franchise termination), and that affected franchisees were "third party beneficiaries" of the agreement, with independent rights of enforcement.

103. In June 2016, the Attorney General of Illinois took action against Jimmy John's to challenge the patently unfair Employee Non-Competition Agreements. According to the *Chicago Tribune*, Attorney General Madigan noted that "By locking low-wage workers into their jobs and prohibiting them from seeking better paying jobs elsewhere, the companies have no reason to increase their wages or benefits."

104. The Attorney General suit alleged that Jimmy John's "required these at-will, low-wage employees to sign non-competition agreements that limit their employment options for years after leaving employment at a sandwich shop," and that Jimmy John's had "no legitimate business interest to warrant the imposition of any non-competition agreements on shop employees and assistant managers." Rather, the suit alleged, Jimmy John's "only apparent concern has been to chill any effort by employees to consider leaving for another employer." *See People of the State of Illinois, ex rel. Lisa Madigan, Attorney General of the State of Illinois v. Jimmy John's Enterprises, LLC, a Delaware Corporation, and Jimmy John's Franchise, LLC, a Delaware Corporation*, No. 2016 CH 07746 (Circuit Court of Cook County).

105. According to the suit, Jimmy John's provided the Employee Non-Competition Agreements to its franchisees from 2007 through December 24, 2014. On that date, Jimmy

John's apparently removed the non-competition agreement from an electronic version of the Operations Manual that Jimmy John's uses to produce the physical version of the Operations Manual that is distributed to franchisees. It did not, however, inform franchisees that the non-competition agreement had been removed; it did not instruct franchisees that any version of the non-competition agreement should be removed from an existing Operations Manual; and, it did not notify franchisees that use of the non-competition agreements should be discontinued or that existing agreements should be voided. According to the Attorney General's suit, Jimmy John's franchisees continued to require employees to sign the Employee Non-Competition Agreements "because they continue to believe that such agreements are suggested and endorsed by [Jimmy John's] corporate office."

106. In December 2016, the Circuit Court of Cook County, Illinois (Chancery Department) entered its Order and Consent Decree, pursuant to which Jimmy John's agreed to pay to the Attorney General $100,000 to resolve the suit. Jimmy John's agreed that it would use reasonable best efforts to ensure that any future use of non-competition agreements in the State of Illinois comply with Illinois law. Jimmy John's agreed to remove such provisions from handbooks, manuals, Operations Manuals, and employment resources used in Illinois. Jimmy John's also agreed to notify franchisees in Illinois that the AG had concluded that the provisions at issue are unenforceable in Illinois, and that the AG had asked Jimmy John's to inform the franchisees that the AG believes franchisees should void any such agreements. *See People of the State of Illinois, ex rel. Lisa Madigan, v. Jimmy John's Enterprises, LLC, a Delaware Corporation, and Jimmy John's Franchise, LLC, a Delaware Corporation*, No. 2016 CH 07746 (Circuit Court of Cook County). The settlement did not resolve any civil liability or provide restitution to employees. None of this actually voided any existing franchisee's Employee Non-

Competition Agreement then in existence in Illinois (or elsewhere, where it required no action).

107. In June 2016, Jimmy John's agreed to take similar actions within the State of New York (without the $100,000 payment) in order to close out an investigation by the Office of the Attorney General of the State of New York. Like the resolution with the Illinois Attorney General, no civil liability was resolved in New York, Jimmy John's provided no restitution to employees, and no action there actually voided any existing Employee Non-Competition Agreement then in existence in New York (or elsewhere).

108. Jimmy John's franchisees' broad no-hire agreement has a long history, dating back to at least 2007. It remains evidenced in every single franchisee's franchise agreement. In numerous still-operative pre-2015 franchise agreements and in (likely) thousands of still-operative Employee Non-Competition Agreements, it remains evidenced in its strictest form: franchisees agreeing outright not to hire each other's employees, agreeing outright to restrict their own employees' ability to be hired by other franchisees, and (purportedly) binding employees to these agreements against threat of legal action and liability. Against this history, and in light of the onerous contractual remedies for its violation and Jimmy John's own lack of commitment to ending the agreement, Jimmy John's franchisees have continued to adhere to their broad no-hire agreement to the detriment of employees.

109. The no-hire agreement among Jimmy John's franchisees is short-sighted and ultimately not in the independent franchisees' interest, even though it is in the interest of the conspirators as a whole when acting together.

110. The no-hire agreement does not serve the interests of ensuring that Jimmy John's restaurants produce a quality product.

111. The no-hire agreement does not serve fast-food customers because it does not

incentivize Jimmy John's franchisees to invest in training workers to improve the Jimmy John's food, experience, and service.

112. Consumers can gain from competition among employers because a more competitive workforce may create more or better goods and services. Further, unemployment is at record lows, yet wage growth has remained sluggish. Fast-food workers regularly rely on public assistance to supplement their income. Higher wages would lessen the strain on public assistance, benefiting all consumers.

113. Most importantly, the no-hire agreement is not in the interest of Jimmy John's restaurant employees. Employees are critical to the success of Jimmy John's franchises. A significant component of making the franchise profitable is hiring qualified, motivated, and superior employees.

114. Therefore, it is in the independent interest of each Jimmy John's franchise to compete for the most talented and experienced restaurant employees.

115. By adhering to the no-hire agreement, franchisees artificially restrict their own ability to hire other employees in a manner that is inconsistent with their own unilateral economic interests. By acting in concert, however, they also artificially protect themselves from having their own employees poached by other franchises that see additional value in those employees, such as the employees' training, experience and/or work ethic. This allows franchisees to retain their best employees without having to pay market wages to these employees or to compete in the marketplace relative to working conditions and promotion opportunities.

116. The no-hire agreement does not serve employees because it does not incentivize Jimmy John's franchisees to invest in higher wages, benefits, and improved working conditions.

It also dis-incentivizes employees to perform their best work as those efforts are not rewarded commensurately. Competition among employers helps actual and potential employees through higher wages, better benefits, and other terms of employment.

117. Jimmy John's franchisees have a shared interest, however, in keeping labor costs low. As noted above, franchisees pay to Jimmy John's royalties based on a percentage of gross sales. Cost of labor therefore has a direct impact on franchisee profitability.

118. Further, in the face of increasing competition for customers, national fast food chains and franchisors like Jimmy John's need to keep customer prices low, but also grow system-wide revenue in order to please their board members and ownership. They often turn to "value menus" or run other special deals, dictating product sale prices or terms to their franchisees. In April 2016, for instance, Jimmy John's offered $1 Jimmy John's subs to celebrate its "Customer Appreciation Day." Franchisees must meet these prices, but they also remain responsible for the unchanged cost of labor required to meet that promotion. Jimmy John's helps its franchisees keep labor costs low by orchestrating and policing the no-hire agreement among them.

119. But for the no-hire agreement, each Jimmy John's franchise is its own economic decision-maker with respect to hiring, firing, staffing, promotions and employee wages. But for the no-hire agreement, each Jimmy John's franchise (and Jimmy John's itself) would compete with each other for the best-performing employees.

**Other Evidence of Jimmy John's System-Wide Commitment to Suppressing Employee Wages and Mobility and of the Unlawful Agreement**

120. Even if wages are not precisely uniform among the competing franchisee stores, low wages are consistent across the Jimmy John's system. This has allowed Jimmy John's owners and executives, and Jimmy John's franchisees, to become wealthy on the shoulders of

hardworking employees who often have to seek government benefits just to put food on their own tables. A significant reason for this is that Jimmy John's has orchestrated an agreement among franchisees to stifle employee wages and mobility.

121. Employee online reviews consistently report low wages and high management turnover at Jimmy John's restaurants. Management employees complain of "no health benefits" and "no raises, no praise for being there a long time." As recently as November 12, 2017, one former employee complained of being paid "minimum wage at $7.25" despite working over one year. The lack of opportunity for advancement at Jimmy John's restaurants is made possible by the franchisees' no-hire agreement. If franchisees had to either pay and promote good employees, or lose them to competitor franchisees, they would be forced to pay competitive wages and provide competitive promotion opportunities. However, because of the no-hire agreement, and because the education, training and experience within the Jimmy John's system are unique to Jimmy John's and not transferrable to other restaurants, Jimmy John's franchisees do not have to compete with other Jimmy John's franchisees, and do not have to compete with non-Jimmy John's businesses for their employees except at the entry-level position.

122. A study conducted by Anzalone Liszt Grove Research and released by *Fast Food Forward* showed that approximately eighty-four percent (84%) of all fast food employees working in New York City in April 2013 had been paid less than their legal wages by their employers.

123. From 2007 to 2011, fast food workers in the U.S. drew an average of $7 billion of public assistance annually as a result of low wages.

124. Jimmy John's workers earn what many low-end service sector workers earn: a minimum wage, or slightly better income, with little employee benefits and long work shifts.

125. Only 27 percent of low-income workers, including the fast food industry, receive paid sick leave.[12]

126. Jimmy John's workers do not receive paid sick days and have to find their own replacements when sick. Jimmy John's institutes a demerit-based disciplinary system for attendance and issues demerits to employees who are unable to find a fill-in.

127. Jimmy John's workers have lodged complaints of being forced to regularly work "off the clock" due to low payroll budgets causing minimum wage and overtime violations.

128. As referred to herein, numerous Jimmy John's management employees have instituted Fair Labor Standards Act (and state law) claims asserting that they have been systematically mis-classified as "exempt" employees. *See*, *e.g.*, *In re Jimmy John's Overtime Litigation*, No. 14-cv-05509 (N.D. Ill.).

129. In a November 2012 interview with Fox News, Jimmy John's founder, James John Liautaud, discussed a plan to decrease Jimmy John's workers' hours to 28 hours per week for tens of thousands of hourly workers, all to avoid the Affordable Care Act's requirement to provide health coverage or pay a penalty.

130. Jimmy John's and its franchisees also are well-versed in no-poaching efforts as they regularly employ highly restrictive "non-compete" agreements binding the franchise owners.

131. Under the Jimmy John's franchise agreement, franchisees agree that during the term of the agreement neither they nor their spouse will "have any direct or indirect controlling interest" in a "Competitive Business" in any location. The franchise agreement defines "Competitive Business" as a "restaurant or other food-service business" that derives more than

---

[12] Available at http://www.epi.org/blog/paid-sick-leave-provides-economic-and-health-security-to-over-a-million-federal-contract-workers/ (last visited January 18, 2018).

10% of its revenue from selling "submarine, hero-type, deli-style, pita and/or wrapped or rolled sandwiches," or any franchise doing the same. Franchisees agree to obtain similar covenants from senior personnel Jimmy John's specifies, including managers. Similar non-compete obligations apply to franchisees after the termination of the franchise.

132. As discussed above, Jimmy John's prepared and distributed to its franchisees form Employee Non-Competition Agreements. Franchisees used these forms to force employees—including at will and low-wage hourly sandwich shop employees and delivery drivers—to sign as a condition of employment. Those "agreements" utilize the same purported "Competitive Business" standard to restrict employee work opportunities.

133. Franchisees are thus thoroughly immersed in the Jimmy John's system's no-hire and "non-competition" policies. Franchisees execute their own agreements not to compete (entered into as a part of the franchise agreement), impose on their workers Employee Non-Competition Agreements that Jimmy John's created and provided, and broadly agree not solicit, recruit, or hire each other's employees.

134. Additional evidence also supports the notion that franchisees have agreed not to hire each other's employees and had means to police the agreement. As noted above, the Employee Non-Competition Agreements purported to require employees to inform their franchisee employer any time a "competing" employer (which would include another franchisee) offered employment. In addition, online employment applications for Jimmy John's restaurants ask applicants whether they have ever been employed by the current Jimmy John's or by any other Jimmy John's store before, and if so, request employment dates, location, and supervisor information. That question is separate and apart from the history of employment portion on the application, allowing prospective employers easily to flag applicants who might be subject to the

no-hire agreement.

135. The Jimmy John's franchise agreement and the Employee Non-Competition Agreements describe onerous remedies for violation of the no hire agreement among franchisees. Jimmy John's has admitted that these provisions reflect rights "created between franchisees."

136. In addition to their shared motivation to enforce the no-hire agreement, and their actual understanding of the no-hire agreement, Jimmy John's franchisees also have abundant opportunity to communicate about and coordinate their no-hire agreement. Jimmy John's holds annual or biennial franchisee conventions, where franchisees gather, meet, attend workshops and roundtables, and compete in sandwich-making contests.

137. The Jimmy John's Franchisee Association ("JJFA"), an independent association of Jimmy John's franchise owners, also holds both an annual convention and quarterly member gatherings. The JJFA represents more than 2,000 Jimmy John's stores nationwide, and states as its mission "to create a credible voice between association members and Jimmy John's management for the purpose of better communication and enhancing the profitability of our stores. We provide a reliable platform for our members to communicate, share information, voice their concerns and negotiate pricing."

138. Jimmy John's franchisees participate in shared regional advertising groups in connection with which they communicate with other nearby franchisees. Jimmy John's mandates franchisee participation in Regional Advisory Franchisee Councils when it sets these up. These councils focus on, among other things, problem-solving methods, regional advertising, and "coordinating franchisee efforts." These, again, present ample opportunity for franchisees to communicate and coordinate about their shared no-hire agreement.

139. According to testimony provided by Jimmy John's CEO in the *In re Jimmy*

*John's Overtime Litigation* matter, Jimmy John's sometimes shares employee compensation information with Jimmy John's franchisees.

**Employment with Non-Jimmy John's Brands is Not a Reasonable Substitute for Jimmy John's Employees**

140. Training, education, and experience within the Jimmy John's system are not transferrable to other restaurants for a number of reasons.

141. Jimmy John's requires initial and ongoing training of employees, and requires rigorous training to qualify as a certified manager. Jimmy John's has its own Director of Training, a formal training staff, and proprietary training procedures and programs. Many of the skills required are proprietary to Jimmy John's, including qualification as what Jimmy John's calls a "Certified Mayo Master" and a "Certified Slicing Master." Certified Manager training includes a 3-week initial training period and a 4-week apprenticeship program.

142. Jimmy John's restaurants utilize Jimmy John's own proprietary computer systems and platforms, including an integrated point-of-sale system, a "back office" system, and other systems which new franchisees must purchase through Jimmy John's approved suppliers. Franchises electronically submit their store financial information to Jimmy John's in specified Jimmy John's formats. Experience with these systems is of little value to other restaurants.

143. Jimmy John's restaurants also utilize proprietary store operating procedures, methods of inventory control and bookkeeping/accounting procedures, and Jimmy John's prescribed equipment. Jimmy John's treats much of its operational information as "confidential" or trade secret-protected, including recipes, specifications, training and operations manuals, and methods, formats and specifications.

144. A no-hire agreement like the agreement among Jimmy John's franchisees reduces workers' outside options and attempts to lower employee quit rate, thereby increasing the share

of net-returns captured by employers. Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the franchise chain can be used only by a single franchisee pursuant to the agreement.

## REPRESENTATIVE PLAINTIFF ALLEGATIONS

**Plaintiff Sylas Butler**

145. In or about August 2015, Plaintiff Butler began working for Kidds Restaurant, Inc., at its Jimmy John's store located in Madison County, Illinois. At all relevant times, Plaintiff was an at-will employee, paid on an hourly basis, or on an hourly basis plus mileage.

146. Plaintiff Butler was required to, and did, sign the form Jimmy John's Employee Non-Competition Agreement.

147. Plaintiff Butler worked both as a delivery driver (earning $5.50 per hour plus fifty cents per mile driven) and as an in-store employee (earning minimum wage). He did not receive medical or other employment benefits.

148. During his employment, Plaintiff Butler wished to work additional hours and to earn more money. His supervisor repeatedly reduced his hours and, by January 2017, Plaintiff Butler was offered only about four hours of work per week.

149. Because Plaintiff was unable to transfer to a competing franchise restaurant, his only options were to stay stagnant at the Kidd's Jimmy John's store, or to quit and start over at an entry-level job and wage in another industry. In or about January 2017, he chose to quit and search for other employment.

**Antitrust Injury**

150. Plaintiff has suffered reduced wages, reduced hours, reduced employment benefits, loss of professional growth opportunities, and worsened, illegal working conditions because of the express restraint of trade among Jimmy John's franchisees, as orchestrated by

Jimmy John's itself.

151. Suppressed wages and employment benefits resulting from employers' agreement not to compete with each other in the labor market is injury of the type the antitrust laws were intended to prevent and flows from that which makes the no-hire agreement unlawful.

152. Additionally, the no-hire agreement embodies norms that are widely accepted across the fast-food industry and are familiar to franchisees. In advising new restaurant owners on how to hire their first general manager, one industry expert instructs that, "you have to be careful that you do not earn a reputation for stealing other people's employees."

153. The potential for broader collusion in franchise chains is enhanced when no-poach agreements are in place. Collusion is promoted when the no-poach agreements can be easily generated and monitored amongst a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

154. The Jimmy John's franchisees' no-hire agreement significantly restricts the employment opportunities for low-wage workers at all Jimmy John's restaurants, including "inshoppers," who take customer register and phone orders, and delivery drivers. Such a restriction causes a wider effect upon all Jimmy John employees and could potentially reach tens of thousands of businesses throughout the United States that, in some way, shape, or form, also sell sandwiches.

155. Plaintiff was a victim of the no-hire agreement. By adhering to that agreement, otherwise independently owned and operated competitor businesses suppressed wages and stifled labor market competition for improved employment opportunities.

## CLASS ALLEGATIONS

156. Plaintiff brings this action on his own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3), which is

initially defined as:

> All persons in the United States who are current or former employees at a Jimmy John's franchise restaurant.

157. Alternatively, Plaintiff brings this action on his own behalf, and on behalf of a class of Illinois plaintiffs, pursuant to Rule 23(a), 23(b)(2), and/or 23(b)(3). Plaintiff reserves the right to modify, change, or expand the class definitions upon discovery and further investigation.

158. Except where necessary to differentiate, the Nationwide Class and the alternative Illinois Class, and their members, shall be referred to herein as the "Class," the "Classes" or "Class Members." Excluded from the Classes are Defendants, their affiliates, officers, and directors, the Judge(s) assigned to this case, and the Judge's immediate family.

159. Numerosity: Upon information and belief, the Classes are so numerous that joinder of all members is impractical; there are over 2,700 Jimmy John's restaurants in the United States. While the exact number and identities of the individual Members of the Classes are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that thousands of Class Members are the subjects of the Class.

160. Existence and Predominance of Common Questions of Fact and Law: Common questions of fact and law exist as to all Members of the Class. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to, whether:

a. Defendants orchestrated and/or engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

b. Defendants' conduct constituted unfair competition;

c. Defendants' conduct constituted unlawful, unfair, and fraudulent business acts

and practices;

d. Defendants violated the Sherman Antitrust Act, 15 U.S.C. §§ 1, *et seq.*;

e. Defendants violated the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*;

f. Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

g. Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

h. Plaintiff and Class Members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, injunctive relief, and/or other relief; and

i. The amount and nature of such relief to be awarded to Plaintiff and the Class.

161. Typicality: All of Plaintiff's claims are typical of the claims of the Class inasmuch as Plaintiff was employed at a Jimmy John's franchise restaurant subject to the no-hire agreement, and each Member of the Class either was or is an employee of a Jimmy John's franchise restaurant subject to the same agreements. Further, Plaintiff and all the Members of the Class sustained the same monetary and economic injuries of being subjected to artificial suppression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiff seeks relief against Defendants for himself and all Class Members.

162. Adequacy: Plaintiff is an adequate representative because his interests do not conflict with the interest of the Classes that he seeks to represent, he has retained counsel competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously. The interest of the Class will be fairly and adequately protected by Plaintiff and his counsel.

163. Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Classes. The injuries suffered by each individual Class Member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Classes individually to redress effectively the wrongs done to them. Even if the Members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgements. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, Members of the Classes can be readily identified and notified based on, inter alia, Defendants' employment records and records maintained by franchisees.

164. Defendants have acted, and refuse to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT I

### Violations of Sherman Act Section 1, 15 U.S.C. § 1, *et seq*.

### (By Plaintiff on Behalf of the Nationwide Class and, Alternatively, the Illinois Class)

165. Plaintiff, on behalf of himself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this complaint.

166. Defendants orchestrated, entered into, and engaged in unlawful contracts,

combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq*.

167. Defendants engaged in predatory and anticompetitive behavior by restricting competition among Jimmy John's franchisees, which unfairly suppressed employee wages, and unreasonably restrained trade.

168. Defendants' conduct included concerted efforts, actions and undertakings among the Defendants and franchisee owners with the intent, purpose and effect of: (a) artificially suppressing the compensation of Plaintiff and Class Members; (b) eliminating competition among franchise owners for skilled labor; and (c) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

169. Defendants perpetuated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

170. Defendants' conduct in furtherance of the no-hire agreement were authorized, ordered, or executed by their respective officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

171. Plaintiff and Class Members have received lower compensation from Jimmy John's franchise businesses than they would otherwise would have received in the absence of Defendants' unlawful agreement and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

172. Defendants' contracts, combinations, and/or conspiracies reflect per se violations of Section 1 of the Sherman Act.

173. In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the

arrangements in question would have an anticompetitive effect on employees and labor.

174. Defendants' contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

175. As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

176. Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. § 26, injunctive relief, for the violations of the Sherman Act and the threatened continuing violations alleged herein.

**COUNT II**

**Violations of the Illinois Antitrust Act, 740 ILCS 10/1, *et seq.***

**(By Plaintiff on Behalf of the Nationwide Class and, Alternatively, the Illinois Class)**

177. Plaintiff, on behalf of himself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this complaint.

178. Defendants orchestrated, entered into, and engaged in unlawful contracts, combinations, and/or conspiracies in restraint, trade or commerce in violation of Illinois Antitrust Act, 740 ILCS 10/1, *et seq*.

179. As alleged above, Defendants orchestrated and/or engaged in predatory and anticompetitive behavior to not solicit restaurant-based employees among Jimmy John's franchise restaurants. The no-hire agreement was not an agreement involving traditional labor disputes subject to state and federal labor laws.

180. Defendants' specific intent has been to substantially lessen competition in the market for employee labor among Jimmy John's restaurants and to limit the compensation, benefits, and opportunities for such positions.

181. A substantial amount of trade and commerce has been affected and will continue to be affected, in the market for Jimmy John's employees as a result of Defendants' unreasonable restraint of trade and commerce.

182. A substantial portion of Defendants' behavior constituting the violations alleged above occurred in the State of Illinois and has had a substantial impact on trade or commerce within the State of Illinois.

183. As alleged above, Defendants' contract, combination, and/or conspiracy constitutes unreasonable restraints on trade and commerce, all of which are per se violations of the Illinois Antitrust Act, 740 ILCS 10/3, *et seq*., or in the alternative, violations under a "Quick Look" analysis and/or the rule of reason.

184. As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class Members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

185. Plaintiff and the Class Members are entitled to treble damages, attorneys' fees, reasonable expenses, and costs of suit for the violations of the Illinois Antitrust Act alleged herein.

## COUNT III

**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*.**

**(By Plaintiff on Behalf of the Nationwide Class or, Alternatively, the Illinois Class)**

186. Plaintiff, on behalf of himself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this complaint.

187. At all times relevant, Plaintiff, the Class, and Defendants all were persons within the meaning of 815 ILCS 505/1(c).

188. At all times relevant, Plaintiff and the Class were consumers within the meaning of 815 ILCS 505/1(e). Plaintiff and the Class are consumers within the meaning of the Illinois Consumer Fraud Act given that Defendants' practices were addressed to the market generally and/or otherwise implicate consumer protection issues, including, but not limited to, the fact that a lack of competitive workforce in the franchise industry inhibits the offering of better goods and services, restricts wages and mobility of the workforce, creates a strain on public assistance, and thereby affects all consumers generally, including Plaintiff and the Class.

189. At all times relevant, Defendants' acts and omissions occurred in the course of trade and commerce within the meaning of 815 ILCS 505/1(f).

190. Section 2 of the Illinois Consumer Fraud Act provides, in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use of or employment of any deceptive, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use of employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the

> interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

815 ILSC 505/1 (footnotes omitted).

191. Defendants' actions to restrain trade and fix the total compensation of the Class Members constitutes unfair competition and unlawful, unfair, and fraudulent business acts and practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*.

192. Defendants illegally orchestrated, entered into, and engaged in an agreement among competitors that restrained employees from engaging in a lawful profession, trade, or business. Defendants perpetuated the scheme with the purpose of fixing lower costs to the benefit of Defendants and franchise owners.

193. Defendants have committed unfair or deceptive acts by engaging in the acts and practices alleged herein. Defendants' conduct included concerted efforts, actions and undertakings among the Defendants and franchise owners with the intent, purpose and effect of: (a) creating and carrying out restrictions in trade and commerce; (b) artificially suppressing the compensation of Plaintiff and Class Members; (c) eliminating competition among franchise owners for skilled labor; (d) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions; and (e) fixing the compensation of Class Members at artificially low levels; and (f) creating a burden on public assistance, constituting unfair competition and unlawful, unfair, and fraudulent business acts and practices within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. Defendants' conduct violates public policy by unfairly suppressing employee wages, and unreasonably restraining trade, and Plaintiff and the Class had no choice but to submit to whatever employment terms were imposed, thereby preventing Plaintiff and the Class from

negotiating better wages and conditions, causing substantial injury by interfering with prospective relations and stifling competition.

194. Defendants' conduct, individually and in concert as alleged above and herein is immoral, unethical, oppressive, unjust, unconscionable and unscrupulous, and caused and continues to cause substantial economic injury to Plaintiffs and the Class.

195. Defendants' conduct is driven by greed, profiteering, and conspiracy to artificially suppress the supply and demand for workers to the detriment of Plaintiffs and the Class as alleged herein.

196. Defendants intended that Plaintiff and the Class rely on material misrepresentations, deceptions, unfair practices, and/or omissions alleged herein.

197. Defendants' unfair and deceptive conduct are willful and wanton, and constitute intentional violations of the relevant statutes.

198. As a result of Defendants' violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Defendants have unjustly enriched themselves at the expense of Plaintiff and the Classes. The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue.

199. The conduct is unfair, unlawful, or unconscionable under Illinois law.

200. To prevent their unjust enrichment, Defendants and their co-conspirators should be required to disgorge their illegal gains for the purpose of making full restitution to all injured Class Members identified hereinabove.

201. Defendants should also be permanently enjoined from continuing their violations of the Illinois Consumer Fraud and Deceptive Business Practices Act.

202. A substantial portion of Defendant's behavior constituting the violations alleged

above occurred in the State of Illinois and has had a substantial impact on trade or commerce within the State of Illinois.

203. As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Members of the Class have suffered and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of himself and on behalf of Members of the Class, requests that this Court:

A. determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B. appoint Plaintiff as the representative of the Class and his counsel as Class Counsel;

C. declare that Defendants' actions as set forth in this complaint violate the law;

D. award Plaintiff and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. §1, to be trebled in accordance with those laws;

E. award Plaintiff and the Class damages in an amount according to proof against Defendants for Defendants' violations of 740 ILCS 10/1 *et seq.*, to be trebled in accordance with those laws;

F. award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class Members are entitled;

G. grant equitable relief, including a judicial determination of the rights and responsibilities of the parties;

H. grant a permanent injunction enjoining Defendants from orchestrating, entering into, engaging in, enforcing, or adhering to any existing agreement that unreasonably restricts competition as described herein;

I. declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

J. grant judgment against Defendants and in favor of Plaintiff and each Member of the Class he represents, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by them and/or imposing a constructive trust upon Defendants' ill-gotten gains, freezing Defendants' assets, and/or requiring Defendants to pay restitution to Plaintiff and to all Members of the Class of all funds acquired by means of any act or practice declared by this Court to be unlawful, unfair, or fraudulent;

K. declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class Members;

L. award pre-judgment and post-judgment interest on such monetary relief;

M. award reasonable attorneys' fees and costs; and

N. grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 24, 2018

Respectfully submitted,

**MCCUNE WRIGHT AREVALO LLP**

*s/ Derek Y. Brandt*

Derek Y. Brandt #6228895
100 North Main Street, Suite 11
Edwardsville, Illinois 62025
T: (618) 307-6116
F: (618) 307-6161
dyb@mccunewright.com

Richard D. McCune*
California State Bar No. 132124
Michele M. Vercoski*
California State Bar No. 244010
3281 E. Guasti Road, Suite 100
Ontario, CA 91761
Tel: (909) 557-1250
Fax: (909) 557-1275
rdm@mccunewright.com
mmv@mccunewright.com

Joseph G. Sauder*
Pennsylvania State Bar No. 82467
555 Lancaster Avenue
Berwyn, PA 19312
Tel: (610) 200-0339
Fax: (610) 727-4360
jgs@mccunewright.com

**Pro Hac Vice* Application to be Submitted