# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

SYLAS BUTLER, on behalf of himself
and all others similarly situated,

   Plaintiffs,

  v.

JIMMY JOHN'S FRANCHISE, LLC, et
al.,

   Defendants.

Case No. 18-cv-0133-MJR-RJD

## MEMORANDUM AND ORDER

**REAGAN, Chief Judge:**

Section 1 of the Sherman Act prohibits certain agreements that restrain trade. This class action asks whether franchisees of the national sandwich chain "Jimmy John's" violated Section 1 by agreeing amongst themselves and with corporate headquarters not to hire employees that have worked at another Jimmy John's location within the preceding year. The defendants—Jimmy John's Franchise, LLC, Jimmy John's Enterprises, LLC, and Jimmy John's LLC (together, "Jimmy John's")—have now moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) & (6) for a lack of standing and for failure to state a claim. (ECF No. 28.) For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss.

## I. BACKGROUND

Jimmy John's sells and delivers deli-style sandwiches. The chain has over 2,700 locations in more than 40 states plus the District of Columbia. (Compl. ¶ 36, ECF No. 1.) About 98% of these locations are franchisees that are independently owned and operated as separate entities from Jimmy John's corporate; the other two percent are owned and operated by Jimmy John's itself. (*Id.*) Basically, when a franchisee contracts with Jimmy John's, the franchisee signs a ten-year franchise agreement for a fee of $35,000. (*Id.* at ¶ 40.) Those agreements then allow the franchisee to utilize the Jimmy John's brand in the operation of an independently owned store. (*Id.* at ¶ 42.)

According to the plaintiff, these agreements give the franchisees significant amounts of independence. Not only do the contracts explicitly provide that the franchisees are independent of Jimmy John's, but the agreements also state that the franchisees (1) are responsible for developing the restaurant, including all obligations and liabilities of the business; (2) do not receive an exclusive territory; (3) and may face competition from other franchisees, including in the same delivery area. (*Id.* at ¶¶ 50, 61–63.) Moreover, a franchisee must identify itself as the owner of its specific store in all dealings with external entities, and it must place notices of independent ownership on any forms, business cards, advertising, or any other materials that Jimmy John's requires. (*Id.* at ¶ 52.) Most importantly, the franchise agreements outright disclaim that Jimmy John's and the franchisees are agents, joint venture partners, or employees of the

other "for any purpose." (*Id*. at ¶ 51.) The President and CEO of Jimmy John's has testified under oath in another case that the franchisees "independently own[] and operate[] a franchise business that stands in an arm's length contractual relationship with Jimmy John's," and that franchisees and Jimmy John's are not agents or partners "for any purpose"—just as stated in the franchise agreements. (*Id*. at ¶ 54.)

This case arises from something that Jimmy John's *does* make the franchisees do. The franchise agreements order that the franchisee must not "solicit or initiate recruitment of any person then employed, or who was employed within the preceding twelve (12) months, by [Jimmy John's], any of [Jimmy John's] affiliates, or another Jimmy John's Restaurant franchisee." (*Id*. at ¶ 78) (hereinafter the "no-hire provision.") In plain language, this means that one Jimmy John's franchisee cannot hire the employee of another Jimmy John's franchisee, unless that employee has not worked at a Jimmy John's shop in over a year. If a franchisee violates the no-hire provision, Jimmy John's headquarters considers it a non-curable default of the franchise agreement that is grounds for termination of the entire contract. (*Id*. at ¶ 80.) Termination also subjects the franchisee to liquidated damages in the form of up to three years' worth of restaurant royalties, which the franchisee must pay within 15 days of termination. (*Id*. at ¶ 81.) The penalties are even higher if the employee in question is a manager. (*Id*. at ¶ 83.)

The franchise agreements have another common thread that is crucial to the theory of this case: The agreements state that all current and future franchisees are

"third-party beneficiaries" of the no-hire provision. (*Id*. at ¶ 85.) As a third-party beneficiary, each franchisee enjoys an independent right to enforce the no-hire provision against another franchisee, which could lead to a $50,000 fine against the at-fault franchisee. (*Id*. at ¶ 91.) And if a franchisee wants to avoid this whole affair, it is required to obtain written permission from the other franchisee before recruiting that franchisee's current or former employee. (*Id*. at ¶ 89.)

So in order to protect themselves, the franchisees made their employees sign non-compete agreements—designed by Jimmy John's—which set a few ground rules: (1) Employees could not work or have any interest in any other business that sells "submarine, hero-type, deli-style, pita, and/or wrapped or rolled sandwiches" within a few miles of any Jimmy John's franchisee in the United States, both during their employment and for two years afterwards; (2) employees must immediately notify the franchisee of any employment offers made by any competitor; and (3) an employee who violated the agreement would have to reimburse the franchisee and Jimmy John's for all costs and expenses—including attorney's fees—incurred to enforce the agreement against that employee. (*Id*. at ¶¶ 92–97.)

Plaintiff Sylas Butler used to work at a Jimmy John's franchise owned by Kidds Restaurant, Inc. (*Id*. at ¶ 145.) While at the store, Butler worked as both a delivery driver and as an in-store employee. (*Id*. at ¶ 147.) Over the course of about 17 months, Butler's supervisor reduced Butler's hours to about four hours of work per week, even though

Butler wanted to work more. (*Id*. at ¶ 148.) But because Butler was subject to the non-compete agreement, he was unable to transfer to a competing Jimmy John's franchisee or to another sandwich store—so his only options were to (1) stay stagnant at his current Jimmy John's store; or (2) quit and start another entry-level job at a non-sandwich shop. (*Id*. at ¶¶ 146, 149.) Butler ended up quitting. (*Id*.)

Now, Butler brings this class action lawsuit on behalf of a nationwide class of persons who are current or former employees at a Jimmy John's franchise restaurant. (*Id*. at ¶ 156.) The complaint alleges that Jimmy John's utilized the employee no-hire agreements in violation of three statutes: (1) Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq*.; (2) the Illinois Antitrust Act, 740 ILCS 10/1, *et seq*.; and (3) the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq*. Specifically, Butler alleges that Jimmy John's employees have "suffered reduced wages, reduced hours, reduced employment benefits, loss of professional growth opportunities, and worsened, illegal working conditions because of the express restraint of trade among Jimmy John's franchisees, as orchestrated by Jimmy John's itself." (*Id*. at ¶ 150.) Butler also points out that the no-hire agreement affects potentially tens of thousands of businesses in the United States that also sell sandwiches, as Jimmy John's employees are not allowed to go work at those other businesses either. (*Id*. at ¶ 154.)

## II.     LEGAL STANDARDS

### A.     Federal Rule of Civil Procedure 12(b)(1) & Article III Standing

A plaintiff must have standing under Article III of the United States Constitution in order to bring suit; otherwise, the Court does not have jurisdiction to hear the case. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992). For a plaintiff to state a case or controversy pursuant to Article III, he must "prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691–92 (7th Cir. 2015) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). At the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561.

Antitrust cases have a more rigorous standing requirement. A plaintiff must show an "antitrust injury," which is an injury stemming from conduct that the antitrust laws are actually meant to prevent. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 125 (1969). Antitrust injury can result from either the legal violation itself or anticompetitive actions made possible by the violation. *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) (citing *Brunswick Corp.*, 429 U.S. at 489).

With those ideas in mind, Federal Rule of Civil Procedure 12(b)(1) is the proper vehicle to challenge a plaintiff's standing. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir.

2015). That rule allows the Court to consider dismissing a case for lack of subject-matter jurisdiction; but when doing so, the Court treats all well-pleaded allegations in the complaint as true and draws all reasonable factual inferences in the plaintiff's favor. *Bultasa Buddhist Temple of Chicago v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017). Conclusory allegations in the complaint, however, will not suffice—the allegations must be specific and give rise to a plausible right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Silha*, 807 F.3d 169 at 174 (holding that *Iqbal* and *Twombly* apply to Rule 12(b)(1)).

### B. Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) operates in a similar manner to Rule 12(b)(1). The rule allows the Court to dismiss a complaint when it fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Just like with Rule 12(b)(1), the Court must construe "the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). And as always, the complaint must provide specific allegations that give rise to a plausible right to relief—not one that is merely "conceivable" or "speculative." *Twombly*, 550 U.S. 544 at 570; *Iqbal*, 556 U.S. at 678. Moreover, this heightened pleading standard becomes even more stringent in the antitrust context: Discovery in these cases can be incredibly expensive and thus "gives

the plaintiff the opportunity to extort large settlements even where he does not have much of a case," especially when "bare allegations of conspiracy are almost impossible to defend against." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

**C.     The Sherman Act**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. To state a plausible violation of Section 1, a plaintiff must plead enough evidentiary facts to show a (1) "contract, combination, or conspiracy"; (2) by which those involved intend to unreasonably harm or restrain trade or commerce; and (3) which actually injures, harms, or restrains trade or commerce. 15 U.S.C. § 1; *Denny's Marina, Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993). Section 4 of the Clayton Act—which provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue…and shall recover threefold the damages by him sustained"—allows Butler to sue for a violation of the Sherman Act.

In order to determine whether the alleged collusion "unreasonably" restrains trade, a plaintiff must first distinguish whether the collusion is a horizontal agreement or a vertical agreement. Horizontal agreements—agreements made among direct competitors—are typically per se violations of Section 1 because they "always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. CBS,*

441 U.S. 1, 19–20 (1979). Under the per se standard, an agreement is deemed unreasonable "without any inquiry into the market context in which the restraint operates." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 336 (7th Cir. 2012) (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 100). Price fixing amongst horizontal competitors is the classic example of a per se violation of Section 1. *Id*.

Vertical agreements, however—those made up and down the supply chain—are generally subject to a more lenient "rule of reason" analysis, which focuses on "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692 (1978). A plaintiff has a much higher burden here: He must show the existence of anticompetitive effects in the relevant product and geographical markets, in which the defendant must have market power. *Agnew*, 683 F.3d at 335–36 (citing *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006). The burden then shifts to the defendant to show procompetitive justifications for the restraint. *Id*. (citing Areeda, *Antitrust Law*, ¶ 1507b, at 397 (1986)).

There is also a third, albeit rarely-used test: The quick-look approach. Courts will use this test where the per se framework is inappropriate—such as when the restraint is a vertical agreement—but where the anticompetitive effects of the agreement are so obvious, even "an observer with even a rudimentary understanding of economics could

conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999). The quick-look approach may also be appropriate in scenarios where the per se rule would usually apply, but "a certain degree of cooperation is necessary if the [product at issue] is to be preserved." *Agnew*, 683 F.3d at 636. (citing *Bd. of Regents*, 468 U.S. at 117; Hovenkamp, *Antitrust Law*, ¶ 1911c, at 274 (1998)). Under the quick-look approach, if the plaintiff can demonstrate that there are no legitimate justifications for the anticompetitive behavior, then the plaintiff is not required to explain the relevant markets and provide evidence of market power. *Agnew*, 683 F.3d at 636 (citing *Bd. of Regents*, 468 U.S. at 109; *Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n*, 961 F.2d 667, 674 (7th Cir. 1992)). But if the defendant can then show that there are pro-competitive justifications for the restraint, then the burden shifts back to the plaintiff and a full rule-of-reason analysis may be necessary. *Id.* (citing *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 600 (7th Cir. 1996)).

III. **ANALYSIS**

   **A. Standing**

   To begin, Jimmy John's argument about standing is a non-starter. They first argue that Butler has not alleged an injury-in-fact because he "does not allege a single fact that demonstrates any connection between the challenged provision and any injury he claims to have suffered, much less facts that could ever establish causation," but that

is far from the truth. Butler explicitly stated in his complaint that (1) his store required him to sign to employee non-competition agreement, which the franchisees force on their employees in order to enforce the no-hire provision between stores; (2) his store reduced his hours to about four per week, despite Butler's protests; and (3) because of the non-competition agreement—which is in place because of the no-hire provision— Butler could not transfer to another Jimmy John's store or even another sandwich shop in his area. (Compl. at ¶¶ 145–49.) And as described above, the third-party beneficiary provision would allow Butler's store to bring an action against any Jimmy John's store that Butler would have transferred to anyways.

Butler then describes in pages of extensive detail how these provisions suppress employee wages and mobility. For example, one paragraph of the complaint quotes the Attorney General of Illinois in a related case against Jimmy John's, where she stated: "By locking low-wage workers into their jobs and prohibiting them from seeking better paying jobs elsewhere, the companies have no reason to increase their wages or benefits." (*Id*. at ¶ 103.) Another paragraph explains that "[a] no-hire agreement like the agreement among Jimmy John's franchisees reduces workers' outside options and attempts to lower employee quit rate, thereby increasing the share of net-returns captured by employers. Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the

franchise chain can be used only by a single franchisee pursuant to the agreement." (*Id.* at ¶ 144.) And perhaps the best example is this paragraph:

> By adhering to the no-hire agreement, franchisees artificially restrict their own ability to hire other employees in a manner that is inconsistent with their own unilateral economic interests. By acting in concert, however, they also artificially protect themselves from having their own employees poached by other franchises that see additional value in those employees, such as the employees' training, experience and/or work ethic. This allows franchisees to retain their best employees without having to pay market wages to these employees or to compete in the marketplace relative to working conditions and promotion opportunities.

(*Id.* at ¶ 115.)

Just last year, the Seventh Circuit said that "concrete financial injuries, namely deprivation of wages…and financial injuries are prototypical of injuries for the purposes of Article III standing." *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017), *reh'g denied* (Aug. 14, 2017) (citing *United States v. Kerner*, 895 F.2d 1159, 1162 (7th Cir. 1990)). And pursuant to the Rule 12(b)(1) standard, this Court treats all well-pleaded allegations in the complaint as true and draws all reasonable factual inferences in the Butler's favor. *Bultasa Buddhist Temple of Chicago*, 878 F.3d at 573. Accordingly, there should be no dispute at this stage that Butler has Article III standing in this case.

Jimmy John's also argues that Butler does not have antitrust standing because he quit because of "scheduling issues," rather than because the no-hire provision "precluded him from seeking employment from a third-party employer." (Defs.'s Mot. to Dismiss 7, ECF No. 28-1) (quoting *Eichorn v. AT & T Corp.*, 248 F.3d 131, 142 (3d Cir.

2001)). But that is an impermissibly narrow reading of the complaint. As noted above, Butler described the allegations in this case in great detail, including how the no-hire provision led to the employee non-competition agreements and how those agreements harm the labor market for Butler and all other current and former Jimmy John's employees. And "[i]t is well settled that an agreement among employers to control a material term of employment harms competition in the labor market at issue." *Banks v. Nat'l Collegiate Athletic Ass'n*, 977 F.2d 1081, 1095 (7th Cir. 1992) (citing *Radovich v. National Football League*, 352 U.S. 445 (1957); *Nichols v. Spencer Int'l Press, Inc.*, 371 F.2d 332 (7th Cir. 1967)) (further internal citations omitted). Moreover, antitrust laws are meant protect the labor market—among other markets—because "employer conspiracies controlling employment terms...tamper with the employment market and thereby impair the opportunities of those who sell their services there." *Eichorn*, 248 F.3d at 141 (3d Cir. 2001) (holding that employees have standing to litigate a Section 1 claim when a no-hire agreement impeded their abilities to sell their labor to three other companies in the market) (quoting Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 377c (rev. ed. 1995)). So just like with the Article III issue, there should be no real dispute at this stage that Butler has properly alleged an antitrust injury.

## B. The Sherman Act Claim

The next issue is whether Butler has stated a plausible-enough claim under the Sherman Act to survive a Rule 12(b)(6) motion. This question is much more complex

than the standing issue. The first puzzle is how to define the agreements in question: Are they vertical, horizontal, or a combination of the two? Jimmy John's argues that the no-hire agreements are purely vertical: Jimmy John's corporate enters into franchise agreements—which contain the no-hire provision—directly with the franchisees, while the franchisees do not enter into any explicit agreements with each other. Butler, on the other hand, argues that he has pled a strictly horizontal agreement between the franchisees: His idea is that Jimmy John's headquarters orchestrated an agreement amongst the franchisees not to hire each other's employees, and while the contract in question may have been vertical, the *effects* are felt strictly at the horizontal level: Between the franchisees, not between any given franchisee and Jimmy John's corporate. (*See, e.g.*, Compl. ¶¶ 9, 109, 154, 167, 179, ECF No. 1.) Those horizontal effects are even more apparent, according to Butler, given the third-party beneficiary provision that allows franchisees to enforce the no-hire provision against other franchisees.

At this early stage, Butler has carried his burden and stated a plausible violation pursuant to his orchestration theory. Some circuits refer to this as a "hub-and-spoke" conspiracy, where the "hub" firm enters into a collection of vertical agreements with other firms—the "spokes"—and those spokes then enter into a collection of horizontal agreements that make up the "wheel." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015). The idea here is that since the hub orchestrated the

horizontal wheel, it can be held per se liable for that horizontal agreement—even though the hub did not enter into a horizontal agreement itself.

The Seventh Circuit has described that same pattern without explicitly using the phrase "hub-and-spoke." *See generally Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928 (7th Cir. 2000). In *Toys "R" Us*, a dominant toy retailer—unsurprisingly, Toys "R" Us—was afraid of growing competition from discount clubs like Costco. *Id.* at 932. So Toys "R" Us flexed its muscles and basically forced a collection of vertical agreements on ten toy manufacturers—including Hasbro and Mattel—that limited the ability of those manufacturers to sell toys to discount clubs, with the goal of cutting off the supply of toys to discount clubs over time. *Id.* at 932–34. The manufactures signed the agreements, but only on the condition that their competing manufacturers were doing the same thing—otherwise, those rogue competitors would become a dominant supplier of the discount clubs and climb in market share. *Id.* at 932, 936. So the Toys "R" Us President of Merchandising communicated this message to each toy manufacturer, and those manufacturers ended up signing the vertical agreements with that understanding— which resulted in a significant boycott of discount clubs by toy manufacturers. *Id.* at 932–33.

Following a Federal Trade Commission opinion on the matter, the Seventh Circuit was faced with determining whether Toys "R" Us could be held per se liable for a horizontal boycott by the toy manufacturers against the discount clubs. Toys "R" Us

argued that their agreements with the toy manufacturers were simply a collection of vertical agreements, so a rule of reason analysis would govern. *Id.* at 935. But the Seventh Circuit disagreed: Since there was substantial evidence that the toy companies were afraid of Toys "R" Us and would only agree to the behemoth's demands if other competing manufacturers did the same thing—and then because Toys "R" Us went out, communicated those fears, and ensured that each competing manufacturer signed the agreement—Toys "R" Us was per se liable for facilitating the horizontal boycott of the discount clubs. *Id.* at 936–37.

The scheme in this case is similar to the scheme in *Toys "R" Us.* The franchisees are independently-owned horizontal competitors, just like the toy manufacturers. Jimmy John's corporate enters into a franchise agreement with each franchisee, which contains the no-hire provision. The franchisees tacitly agree amongst each other to enforce the no-hire provision through austere enforcement of the employee non-compete contracts. And most damningly, **the franchise agreements give the franchisees a contractual right to enforce the no-hire agreements directly against each other through the third-party beneficiary provision.** That is a horizontal agreement. *See United States v. Apple*, Inc., 791 F.3d 290, 297 (2d Cir. 2015) (holding that when determining whether an agreement is horizontal or vertical, courts should focus on the effects of the restraint rather than the characters who imposed it), *cert. denied*, 133 S. Ct. 1376 (Mar. 7, 2016). And the effect of the scheme is two-fold: (1) a horizontal boycott of

certain employees; and (2) a horizontal price-fixing scheme to suppress the price of labor for said employees—just as Butler has pled. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222–23 (1940) ("Under the Sherman Act[,] a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se," even where the fixing is not "fixed in the sense that [it was] uniform and inflexible…."); *F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990) (horizontal boycott among competing firms aimed at influencing pay rates is per se illegal); *Todd v. Exxon*, 275 F.3d 191, 198 (2d Cir. 2001) (wage-fixing by purchasers of labor can be per se illegal).

But there is one massive elephant in the room that distinguishes this case from *Toys "R" Us*. All of the firms in this case deal in the same brand: Jimmy John's sandwiches. That is quite different from Toys "R" Us going to manufacturers like Hasbro and Mattel in order to injure Costco, because as Jimmy John's points out, antitrust law is more concerned with *inter*brand restrains, not *intra*brand restraints. *See, e.g., Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 54–56, 58 (1977) (holding that an agreement restricting trade within one brand could not be per se illegal because the agreement achieved certain efficiencies within that brand, stimulating competition against competing brands in the market as a whole). But to complicate matters more, Butler has pled in the complaint that Jimmy John's franchisees enjoy very high levels of independence. The franchise agreements state that a particular franchisee may be

subject to competition from other franchisees, and that franchisees are not agents, joint venture partners, or employees of the other "for any purpose." (Compl. at ¶ 51.) This level of independence may be much more than your typical franchise business may enjoy. And at this stage, the Court must accept all well-pleaded allegations in the complaint as true.

This dichotomy puts these proceedings in murky waters: Should the per se rule apply to a horizontal price fixing and group boycott scheme, even though the horizontal agreement is amongst firms dealing in the same brand? Butler recognizes this distinction, considering he pleads in the alternative that the Court should apply the quick-look rule rather than the per se rule. The Seventh Circuit has instructed that the quick-look rule applies in scenarios where the per se rule would usually apply, but "a certain degree of cooperation is necessary if the [product at issue] is to be preserved." *Agnew*, 683 F.3d at 636. (citing *Bd. of Regents*, 468 U.S. at 117; Hovenkamp, *Antitrust Law*, ¶ 1911c, at 274 (1998). This case could prove to be a hornbook example of that rule: Although the franchisees are dealing in the same brand, they are still competitors, and anyone with a rudimentary understanding of economics would understand that the no-hire agreements have an anticompetitive effect on the labor market targeted by those firms. *California Dental Ass'n*, 526 U.S. at 770. And if the quick-look approach applies, Butler would not be required to go through the industry and market power analysis,

and Jimmy John's would be able to argue the procompetitive intrabrand justifications for the agreements.

Ultimately, however, the Court cannot decide at this early stage in the proceedings which rule will apply. If the evidence in this case shows that the franchisees are truly as independent as Butler pleads, this case will likely result in a quick look analysis. If the evidence of franchisee independence is Herculean, then the per se rule might even apply. And if the evidence of franchisee independence is weak, or if Jimmy John's carries its burden under the quick look approach, then the rule of reason may rear its head and burn this case to the ground. But that is a matter for a later stage in these proceedings. At this point, for the foregoing reasons, Butler has stated a plausible claim for relief under Section 1 of the Sherman Act.

### C.      The State Law Claims

The state law claims can be quickly disposed of. Jimmy John's first argues that the Illinois Antitrust Act claim fails because Butler pled that Jimmy John's violated the Act by harming competition "in the market for employee labor among Jimmy John's restaurants," even though the Illinois Antitrust Act expressly states that it does not apply to "labor which is performed by natural persons as employees of others." 740 ILCS 10/4. Jimmy John's is correct: The Seventh Circuit has already said that the Illinois Antitrust Act specifically excludes claims "relate[d] to an alleged market for labor

services." *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1066 (7th Cir. 1997). That is exactly what Butler pleads, and thus his claim is barred. (*See* Compl. ¶¶ 178, 180.)

Second, Jimmy John's argues that Butler's claim under the Illinois Consumer Fraud and Deceptive Business Practices Act fails because (1) Butler has not alleged any conduct that deceives consumers; and (2) Butler cannot convert the statute into an enforcement mechanism for an antitrust claim that is already uncognizable under the Illinois Antitrust Act. Both of these arguments are correct. First of all, Butler and his proposed class are suppliers of labor—not consumers. *See, e.g., See Hess v. Kanoski & Assocs.*, 668 F.3d 446, 454 (7th Cir. 2012). Moreover, the Illinois Supreme Court has instructed that plaintiffs cannot use the Illinois Consumer Fraud and Deceptive Business Practices Act to get around the fact that their theory does not fly under the Illinois Antitrust Act: That "gamesmanship" would be "incongruous" with the state legislature's intent. *Laughlin v. Evanston Hosp.*, 133 Ill. 2d 374, 390-91 (1990); *see also Gaebler v. N.M. Potash Corp.*, 285 Ill. App. 3d 542, 544 (1996). Accordingly, this claim is barred as well.

There is one more matter to address: Butler asked the Court for leave to amend if the Court found any aspect of his complaint to be deficient. *See Foman v. Davis*, 371 U.S. 178 (1962). Both of Butler's state-law claims are deficient. Although the Court is dubious as to whether Butler will be able to plead around the issues in the case and save those

state-law claims, the Court will nevertheless grant Butler 30 days to file an amended complaint—if he so chooses.

IV.     **CONCLUSION**

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Jimmy John's motion to dismiss. (ECF No. 28.) The Court **DISMISSES WITHOUT PREJUIDCE** the state law claims -- Counts II and III. The Sherman Act claim will proceed.

IT IS SO ORDERED.

DATED JULY 31, 2018.

s/ _Michael J. Reagan_
MICHAEL J. REAGAN
United States District Judge
