# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DONALD CONRAD,
*On Behalf of Himself & All Others*
*Similarly Situated,*

      Plaintiff,

v.

JIMMY JOHN'S FRANCHISE, LLC,
JIMMY JOHN'S ENTERPRISES, LLC,
and
JIMMY JOHN'S LLC,

      Defendants.

Case No. 18-CV-00133-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This is an antitrust case brought by Plaintiff Donald Conrad against Defendants Jimmy John's Franchise, LLC; Jimmy John's Enterprises, LLC; and Jimmy John's LLC (*collectively* "Jimmy John's"). According to the Amended Complaint (Doc. 75), a "No-Poach Provision" in Jimmy John's Franchise Agreement effectively prohibited employees from switching between rival locations, stifling competition for labor in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Based on an expert report from economist Dr. Hal Singer, Conrad alleges that the Provision suppressed wages for every Jimmy John's employee by 8.4 percent, causing ▮▮▮▮▮▮▮ in class-wide damages. (Doc. 115-13). But in an Order entered on February 24, 2021 (Doc. 223), the Court excluded the report under *Daubert*. Without expert testimony, Conrad cannot satisfy the predominance requirement under Rule 23.

Yet other issues also preclude class certification: Conrad's claims are atypical of the unnamed class members because the No-Poach Provision was admittedly irrelevant to him; there is a potential conflict between managers and hourly employees; and several individual questions exist that cannot be answered using common proof. So for the reasons below, the Court denies Conrad's Motion for Class Certification, as well as his Motion to Strike.

**BACKGROUND**

Jimmy John's is a franchised sandwich fast-food chain with nearly 3,000 stores across 40 states. (Am. Compl. at 2). About 98 percent of those stores are independently owned and operated by around 800 franchisees. (*Id.*). The individual franchisees—not Jimmy John's—determine how much their employees get compensated. (North Dep. at 56:19–21, Doc. 115-14). Simply put, Jimmy John's "is not responsible for the employment matters of franchisees" (*id.* at 60:3–6), ████████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████." (JJE Bonus Program at 2, Doc. 133-12; Franchise Operations at 6, Doc. 115-24).

Despite their relative independence, franchisees must maintain minimum brand standards to ensure a consistent customer experience across the country. (North Dep. at 70:19–22; McCrary Report ¶¶ 50, 85, Doc. 133-57). These brand standards include "a set of specific training requirements on each franchisee" (McCrary Report ¶ 68), and on "new and existing employees being promoted to the Certified Manager role." (*id.* ¶ 72). But Jimmy John's will only pay to train "up to two employees": "Franchisees must cover

both fees and expenses for each additional employee sent for training." (*Id.* ¶ 80). The estimated total cost to train a certified manager is between ███ and ███ (*Id.*).

From at least 2014 to 2018, Jimmy John's included a so-called No-Poach Provision in its Franchise Agreement. (Conrad's Mem. in Supp. of Mot. for Class Cert. [*hereinafter* "Conrad's Mem."] at 1, 8, Doc. 115). Its terms changed over time. In 2014, for example, the Provision prohibited franchisees from recruiting or hiring anyone "who was employed within the preceding twenty-four (24) months, as a General Manager or Assistant Manager at a JIMMY JOHN'S® Restaurant . . . without obtaining the employer's prior written permission." (2014 Franchise Agreement § 7(d), Doc. 115-17). The Provision was enforced by the franchisees themselves, who could be forced to pay up to $50,000 for violating it. (*Id.*). In 2015, the Provision was amended to only prohibit recruiting (not hiring) but applied to all employees (not only managers). (2015 Franchise Agreement § 7(d), Doc. 133-15). And in 2016, it was limited even more so that the $50,000 penalty applied only when a *manager* was solicited in violation of the Provision. (2016 Franchise Agreement § 7(d), Doc. 133-26).

With that in mind, about 88 percent of employee release requests "were approved without conditions;" and "[o]nly █ approved employee releases were associated with conditions on reimbursement for training expenses." (McCrary Report ¶ 96) (emphasis omitted). In the rare case that "a release was refused for reasons other than poor performance or was approved conditional on compensation, 74 percent . . . involved managers—and training investments were explicitly mentioned in the negotiations for approximately half of those managers." (*Id.* ¶ 97) (emphasis omitted). On the other hand,

non-managers were released 94 percent of the time. (*Id.*). "In other words, . . . the requests were almost always granted, and almost always without cost." (*Id.*).

In February 2018, Conrad started working at a Jimmy John's in Winter Park, Florida, "as an in-shop employee at $8.25 per hour." (Conrad's Resp. to Jimmy John's Second Set of Interrogs. at 7, Doc. 133-43). A month later, "he was promoted to Person In Charge and given a raise to $9.00 per hour." (*Id.*). And a month after that, he was "promoted to a salaried manager earning $91.00 per day." (*Id.*). Then, the area manager asked Conrad to switch to the Orlando location, where he would become a co-manager. (*Id.*). He did, receiving "a raise to $95.00 per day . . . ." (*Id.*). But the new position was short-lived: Conrad did not get along with the franchise co-owner's niece, who worked in the same store and supposedly "specifically targeted [Conrad's] work performance . . . ." (*Id.* at 5). In November, Conrad was fired after he told the niece "that he no longer cared for her opinions." (*Id.*). More accurately, he called her "a fucking bitch." (Conrad Dep. at 308:4–9, Doc. 133-48).

Now, Conrad alleges that the No-Poach Provision "reflects a naked restraint of competition" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (Am. Compl. at 1). In brief, he alleges that the No-Poach Provision had the effect of suppressing wages and stifling worker mobility, leading to class-wide injury and damages. (Conrad's Mem. at 1). The crux of his claim is that without the Provision, franchisees would be pressured to increase their wages to match competing locations or else risk losing their employees. (*Id.* at 15). Even so, Conrad admits that he "made no efforts to obtain employment at [another] Jimmy John's restaurant," (Conrad's Resp. to Second Set of Interrogs. at 6;

Conrad Dep. at 61:10–12), and that the No-Poach Provision was "irrelevant" and "just didn't really have anything to" do with him. (Conrad Dep. at 189:9-14, 205:11-19). Still, he claims that he "suffered reduced wages and inhibited employment opportunities due to the" No-Poach Provision. (Am. Comp. at 7).

Conrad seeks to certify the following class under Federal Rules of Civil Procedure 23(a) and 23(b)(3):

> All persons in the United States who were employed at a Jimmy John's-branded restaurant at any time between January 24, 2014 to July 12, 2018, whether owned and operated as a corporate store or a franchise store.

(Conrad's Mem. at 1).

To support his claim, Conrad points to an expert report prepared by Dr. Hal Singer. (Singer Report at 1, Doc. 115-13). But the Court excluded Dr. Singer's opinions because his wage regressions suffered from a methodological flaw: Dr. Singer failed to adjust for those two percent of the wage data that do not consistently record employee wages as per-shift or per-hour, leading to inflated estimates of impact. (*See* Mem. & Order at 40–46, Doc. 223). On the other hand, the Court admitted both of Jimmy John's expert reports prepared by Dr. Janus Ordover (Ordover Report at 1, Doc. 133-56) and Dr. Justin McCrary (McCrary Report at 1, Doc. 133-57). (*See* Mem & Order at 46–65).

Finally, in responding to Conrad's Motion for Class Certification, Jimmy John's attached declarations from 19 franchise owners. (*See* Scolnick Decl. at 14, Doc. 133-1). But three purportedly never responded to Conrad's "repeated attempts to obtain discovery

from them." (Conrad's Mot. to Strike at 1, Doc. 186). He therefore asks the Court to strike those franchisee-declarations under Federal Rule of Civil Procedure 37. (*Id.* at 5).

### LAW AND ANALYSIS

### A. Motion to Strike

In general, "a party must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information . . . that the disclosing party may use to support its claims or defenses . . . ." FED. R. CIV. P. 26(a)(1)(A). There is also a continuing duty to supplement these disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . ." FED. R. CIV. P. 26(e)(1)(A).

"If a party fails to" meet its disclosure obligations, then the Court may prohibit it from using "that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." FED. R. CIV P. 37(c)(1). "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Mid-America Tablewares, Inc. v. Mofi Trading Co., Ltd.*, 100 F.3d 1353, 1363 (7th Cir. 1996). "[T]he following factors should guide the district court's discretion: (1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003).

Conrad claims that he "made numerous attempts to contact the remaining three franchisee declarants—Butler, Finner, and Severson—regarding their document and deposition subpoenas," but they never responded. (Conrad's Mot. to Strike at 3). He also claims that Jimmy John's counsel refused to accept service of subpoenas on the declarants' behalf. (*Id.* at 3). He thus argues that sanctions are warranted. (*Id.* at 6–9). The Court disagrees.

First, the Court rejects Conrad's contention that Jimmy John's had to serve subpoenas on third parties outside its control. At the center of this case is Conrad's claim that the franchisees "are independently owned and operated as separate and distinct entities from Jimmy John's." (Am. Compl. at 2). *Cf. Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984) ("[O]fficers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy."). In fact, Jimmy John's itself had to serve subpoenas on franchisees when they wanted to depose them or request document production. (*See* Rose Decl., Exs. 1–3, Docs. 195-1, 195-2, 195-3). Conrad also acknowledges that his efforts to serve the other 16 franchisees were made through their respective counsel. (Chan Decl. ¶ 7, Conrad's Reply Ex. 1). In short, Jimmy John's did not have to serve any of the franchisees on Conrad's behalf.

The Court also has reviewed the communications between the litigants and finds that Conrad's inability to depose the remaining three franchisees did not arise from any willfulness, bad faith, or fault of Jimmy John's counsel. Jimmy John's supplemented its initial disclosures in July 2020 with an address for each of the three franchisees. (Jimmy John's Supp. Rule 26(A)(1) Initial Disclosures at 5–7, Doc. 197-2). For Butler and Scott,

Jimmy John's also included a store phone number. (*Id.* at 5, 7). True, these franchisees owned several Jimmy John's-branded stores; and Conrad first contacted Jimmy John's counsel on August 26 complaining of difficulties reaching them. (Email String at 1, Doc. 197-2, Ex. 2). But after a meet-and-confer on September 11, Jimmy John's counsel provided Butler and Finner's personal email addresses and the email address for Severson's attorney. (*Id.* Ex. 5). When they supposedly failed to respond (which Finner disputes (Finner Decl. at 1, Doc. 197-1)), Conrad never sought court intervention, nor did he seek an extension of the deadline. Instead, he waited for the deadline to pass and now asks the Court to exclude the testimony in whole cloth. Such a harsh remedy is inappropriate given that Jimmy John's provided additional points of contact for the three franchisees. And while Conrad's contentions are not without force, any prejudice is harmless: Jimmy John's did not explicitly rely on those franchisee-declarations in opposing class certification, and the Court does not reference them below. In other words, those declarations are in no way dispositive. The Court thus denies Conrad's Motion to Strike.

### B. Motion for Class Certification

Federal Rule of Civil Procedure 23 provides a mechanism by which "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members . . . ." FED. R. CIV. P. 23(a). But "[a]ggregation is not an end unto itself." Principles of the Law of Aggregation Litigation § 1.03 (2010). Rather, the objectives of *fidelity*, *finality*, and *feasibility* guide district courts in determining whether class certification is the fairest and most efficient mode of adjudication. *Id.* Ultimately, the

Court is vested with "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998) (cleaned up); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 630 (1997) (Breyer, J., concurring in part and dissenting in part) ("The law gives broad leeway to district courts in making class certification decisions, and their judgments are to be reviewed by the court of appeals only for abuse of discretion.").

Conrad seeks to certify a class under Rule 23(b). "To achieve certification, a proposed class under Rule 23(b) must meet the requirements of Rule 23(a)—numerosity, typicality, commonality, and adequacy of representation—and one of the alternatives listed in Rule 23(b)." *Howard v. Cook Cty. Sheriff's Off.*, 989 F.3d 587, 597 (7th Cir. 2021). Relevant here, Rule 23(b)(3) permits a class action if "the court finds that questions of law or fact common to the members of the class *predominate* over any other questions affecting only individual members, and that a class is *superior* to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3) (emphasis added). "If the party certification fails to meet any of these . . . requirements, class certification is precluded." *Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 893 (7th Cir. 2012).

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common question of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). That said, "Rule 23 must be liberally interpreted": "Its policy is to favor maintenance of class actions." *King v. Kan. City S. Indus., Inc.*, 519 F.2d 20, 25–26

(7th Cir. 1975); *Messner v. Northshore Univ. Health Sys.*, 669 F.3d 802, 815 (7th Cir. 2012) ("[I]n antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification.") (cleaned up). Even so, Conrad bears "the burden of proving by a preponderance of the evidence that . . . the requirements of Rule 23" are met. *Howard*, 989 F.3d at 597.

### i. Numerosity

"Determining whether the proposed class is sufficiently numerous for certification is usually straightforward. Affidavits, declarations, or even reasonable estimates in briefs are often sufficient to establish the appropriate size of the class and whether joinder might be a practical and manageable alternative to class action litigation." Manual for Complex Litigation § 21.141. "Numerosity is generally presumed when the proposed class would have at least 40 members." *Lapin v Goldman Sachs & Co.*, 254 F.R.D. 168, 175 (S.D.N.Y. 2008) (citing 1 Newberg on Class Actions § 3.05 (2d ed. 1985)); *e.g.*, *In re Gen. Motors Corp. Dex-Cool Prods. Liability Litig.*, 241 F.R.D. 305 (S.D. Ill. 2007); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506 (S.D. Ill. 2004).

The numerosity requirement is uncontested here. Conrad seeks to represent a putative class of over 615,000 current and former Jimmy John's employees. (Conrad's Mem. at 21). The Court agrees that the putative class is "so numerous that joinder of all members is impracticable," thus satisfying the numerosity requirement. *See* FED. R. CIV. P. 23(a)(1).

### ii.  Commonality

"Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury. This does not mean merely that they have all suffered a violation of the same provision of the law." *Dukes*, 564 U.S. at 350 (cleaned up). Rather, "[t]heir claims must depend upon a common contention of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "Identifying common questions typically requires examining the parties' claims and defenses, identifying the type of proof the parties expect to present, and deciding the extent to which there is a need for individual, as opposed to common, proof." Manual for Complex Litigation § 21.141. "'[E]ven a single [common] question' will do." *Dukes*, 564 U.S. at 359 (quoting Richard Nagareda, *The Preexistence and the Structure of the Class Action*, 103 Colum. L. Rev. 149, 176 n.119 (2003)).

Courts often give "superficial treatment of" the commonality requirement given that it "may be a superfluous provision, or at least partially redundant, since the existence of common questions can be viewed as an essential ingredient of a finding that the case falls within one of the three categories of class actions described in" Rule 23(b). Wright & Miller, Federal Practice and Procedure § 1763. Relevant here, because predominance (discussed below) is governed by "a more stringent standard than" commonality, some "courts in actions brought under subdivision (b)(3) have not drawn a distinction between the two requirements." *Id.* Instead, they "either have dealt with the common-issue question simultaneously with their inquiry into whether common questions predominate

or have assumed that Rule 23(a)(2) was satisfied and thought it necessary only to rule on the question whether the suit fit within subdivision (b)(3)." *Id.*; *accord Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (noting that "[t]he same analytical principles govern Rule 23(b)" and Rule 23(a), but "Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)"); *Amchem*, 521 U.S. at 609 ("The Third Circuit recognized that Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions.").

Conrad contends that there are at least three common issues of law and fact: (1) "[w]hether Jimmy John's restaurants entered into an unlawful agreement not to poach one another's employees;" (2) "whether the No-Poach [Provision] should be judged unlawful;" and (3) "whether the agreement suppressed Class members' compensation; and if it did, the magnitude of that effect." (Conrad's Mem. at 22).

In response, Jimmy John's blurs its commonality and predominance arguments; but it devotes most of its attention to arguing that common issues do not predominate. (*See* Jimmy John's Resp. at 13–30) ("Plaintiff also fails to meet his burden of establishing Rule 23(a) commonality and Rule 23(b)(3) predominance."). Given the low threshold for commonality, the Court will not belabor this discussion and will instead focus on the more stringent standard for predominance below.

### iii.  Typicality

The typicality requirement "primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of

the class at large." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983). "'A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'" *Id.* (quoting H. Newberg, *Class Actions* § 1115(b) at 185 (1977)). "The typicality requirement may be satisfied even if there are factual distinctions between the claims and the named plaintiffs and those of other class members. Thus, similarity of legal theory may control even in the face of differences of fact." *Id.* But "[e]ven though some factual variations may not defeat typicality," *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006), there must still "be enough congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group," *Spano v. Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011).

Conrad simply alleges that the typicality requirement is satisfied because "he worked in a Jimmy-John's-branded restaurant . . . ." (Conrad's Mem. at 22–23). But his core allegation is that the No-Poach Provision prevented workers from changing locations for better wages. Yet Conrad was not among those employees: He did not leave his job at Jimmy John's in search of higher wages, and he was never denied the opportunity to change locations because of the Provision. Indeed, he admits that he "made no efforts to obtain employment at [another] Jimmy John's restaurant" (Conrad's Resp. to Second Set of Interrogs. at 6; *see also* Conrad's Dep. at 61:10–12), and that the No-Poach Provision was "irrelevant" and "just didn't really have anything to" do with him (Conrad's Dep. at 189:9-14, 205:11-19). Rather, he was fired after he called a coworker—

his boss's niece—"a fucking bitch." (*Id.* at 308:4–9). So while some factual distinctions will not preclude class certification, Conrad's claim is atypical of those putative class members who were actually denied the opportunity to change locations for better wages because of the No-Poach Provision. The typicality requirement is therefore not met.

### iv. Adequacy

"[A]dequacy of representation is composed of two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th Cir. 1993) (quoting *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (en banc)). Only the second part is at issue here.

"Rule 23 contemplates, and the district court should insist on, a conscientious representative plaintiff. All class suits create some conflict between the representative and the class; the representative and counsel may be tempted to sell out the class for benefits to themselves. Judges are on the lookout for persons who may pay inadequate attention to the interests of the others they purport to represent." *Rand v. Monsanto Co.*, 926 F.2d 596, 599 (7th Cir. 1991), *overruled on other grounds*, *Chapman v. First Index, Inc.*, 796 F.3d 783, 787 (7th Cir. 2015). "[T]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation. The fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the

class will suffer." *J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980) (citations omitted).

To that end, "[a] class is not fairly and adequately represented if class members have antagonistic or conflicting claims." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "The adequacy inquiry" thus "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at 625. In other words, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)).

Jimmy John's argues that Conrad failed to establish the adequacy requirement because "there are significant economic conflicts between the interests of managers and the employees they supervised." (Jimmy John's Resp. at 11). It points to two conflicts in particular. First, Jimmy John's contends that because managers were charged with enforcing the allegedly anticompetitive No-Poach Provision, they cannot be in the same class as nonsupervisory employees like in-shoppers and drivers. Put differently, "[a]t any trial of this case, certain managers would be called as defense witnesses, testifying about the very decisions at issue here, and explaining that [the No-Poach Provision] was honored largely in the breach." (*Id.* at 12). Jimmy John's therefore argues that "[t]his is a paradigmatic and preclusive intra-class conflict because many putative class members participated in the challenged employment decisions." (*Id.*) (cleaned up). The Court agrees.

As a general matter, the litigants disagree about whether supervisory and nonsupervisory employees can ever be part of the same class. For its part, Jimmy John's points to *Randall v. Rolls-Royce Corp.*, 637 F.3d 818 (7th Cir. 2011). There, the plaintiff sought to represent a putative class of "female employees of a Rolls-Royce plant" who charged the company "with sex discrimination . . . in paying the members of the class less than comparable male employees by setting the base pay of women employees . . . below that of male employees" and "denying them promotions they would have received had they been men." *Id.* at 820. In affirming the district court's denial of class certification, the Seventh Circuit acknowledged two conflicts between female supervisors and female nonsupervisory employees. *Id.* at 824. For one, the court was concerned that some female supervisors might "deliberately depress the salary of female employees whom they supervise, or increase the salary of male employees whom they supervise, in order increase evidence of discrimination." *Id.* at 824. Additionally, there was "even evidence that the [female supervisors] participated in decisions concerning female employees' compensation that, on their theory of the case, were" in fact "discriminatory." *Id.* (citing *Wagner v. Taylor*, 836 F.2d 578, 595 (D.C. Cir. 1987) ("Supervisory employees are often inappropriate representatives of nonsupervisory employees because the structure of the workplace tends to cultivate distinctly different interests between the two groups.")).

Conrad tries to differentiate *Randall* by noting that *this* case turns on actions by franchise **owners**, not managers. (Conrad's Reply at 3). In other words, the owners were the ones who entered into the supposedly anticompetitive Franchise Agreement, while the managers were just neutrally applying it. (*Id.*). But that position contradicts testimony

suggesting that at least some managers were given broad discretion whether to enforce the No-Poach Provision. For example, one delivery driver and member of the putative class said that "[t]o apply for the job . . . , [he] simply walked into the store, told the **manager** that [he] was currently working at" another Jimmy John's location "and asked if they needed any help. The manager's response was, 'when can you start?'" Indeed, the manager did not "even notify" the franchise owner. (Hanzlik Decl. ¶ 7, Doc. No. 133-82) (emphasis added). Another manager similarly stated that he "never received instructions" from the franchise owner "to seek permission or releases when hiring applicants with prior Jimmy John's experience," and he "recall[ed] hiring about a dozen former Jimmy John's employees." (Arredondo Decl. ¶ 12, Doc. No. 133-78). While Conrad points to *Staton v. Boeing Co.* 327 F.3d 938 (9th Cir. 2003), for the proposition that "supervisors and nonsupervisors may be included in the same certified class when both are subject to the policy or practice challenged by the lawsuit" (Conrad's Reply at 2), the Ninth Circuit there recognized that "whether employees at different levels of the internal hierarchy have potentially conflicting interests is context-specific and depends upon the particular claims alleged in a case." *Staton*, 327 F.3d at 958. The court then said that to satisfy the adequacy requirement, plaintiffs "'must offer evidence of coextensive interests or at least allege the existence of a general discriminatory policy.'" *Id.* at 959 (quoting 5 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*, § 24.42 at 24-170-71 (3d ed. 1992)). "Given that the named plaintiffs include[d] representatives of each major employee sub-group," the court found no conflicts. *Id.* at 959.

This Court too rejects the invitation to adopt a bright-line rule barring classes representing both supervisory and nonsupervisory employees. Yet even under the Ninth Circuit's level-handed approach, Jimmy John's has identified another significant conflict between managers and nonsupervisory employees that precludes certification. Jimmy John's franchisees take part in a profit-sharing program ███████████████████████████ ██████████████████████████████████████████████████████████ ."

(JJE Bonus Program at 2). Given that Conrad accuses the company of using the No-Poach Provision as a tool to "keep labor costs low" (Am. Compl. ¶ 119, Doc. 75), Jimmy John's argues that managers would be encouraged to enforce the provision to increase store profits. (Jimmy John's Resp. at 12). Simply put, not unlike the complicit female employees in *Randall*, "the fact that managers with profit-based bonuses allegedly made more money during the class period by taking steps to lower employee wages would put those class members against one another." (*Id.*).

Conrad, on the other hand, says that the profit-sharing program does not present a conflict because he "does not seek compensation for suppressed bonuses," only suppressed base pay. (Conrad's Reply at 3–4). But even assuming Conrad's theory—that the No-Poach Provision suppressed base pay across the board—is correct, it may equally be true that managers' bonuses exceeded their suppressed base pay. By extension, managers may be willing to suppress their own base pay if enforcing the No-Poach Provision would lead to a greater bonus. And unlike in *Staton*, Conrad is the only named plaintiff: He does not adequately represent the interest of managers who were motivated

to reduce labor mobility so they can reap the benefits of the profit-sharing program. This conflict presents another reason why class certification is inappropriate.

### v. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "While similar to Rule 23(a)'s requirements for typicality and commonality, 'the predominance criterion is far more demanding.'" *Messner*, 669 F.3d at 814 (quoting *Amchem*, 521 U.S. at 623). "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 136 (quoting *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000)). "Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Id.* at 139 (collecting cases). But "[t]here is no mathematical or mechanical test for evaluating predominance." *Messner*, 669 F.3d at 814. "[A] court weighing class certification must" therefore "walk a balance between evaluating evidence to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will ultimately prevail on the merits." *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 376 (7th Cir. 2015) (emphasis in original).

The "predominance requirement is satisfied when 'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single

adjudication.'" *Id.* at 815 (quoting 7AA Wright & Miller, Federal Practice & Procedure § 1778 (3d ed. 2011)). "Or, to put it another way, common questions can predominate if a 'common nucleus of operative facts and issues' underlies the claims brought by the proposed class." *Id.* (quoting *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 228 (2d Cir. 2006)) "'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.'" *Id.* (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)). That said, "[i]ndividual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.*

"Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Messner*, 669 F.3d at 815 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). Here, the Court must examine whether Conrad can "establish each of the three required elements of an antitrust claim— (1) a violation of antitrust law; (2) injury and causation; and (3) damages—using common evidence." *Id.*

As for the first requirement, "Section 1 of the Sherman Act is designed to prevent businesses from entering into collusive agreements . . . ." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). "By its terms, § 1 prohibits '[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce,' though courts have

long restricted its reach to agreements that unreasonably restrain trade." *Id.* (quoting 15 U.S.C. § 15). "To prevail under § 1 under any theory, plaintiffs generally must prove three things: (1) that defendants had a contract, combination, or conspiracy ('an agreement'); (2) that as a result, trade in the relevant market was unreasonably restrained; and (3) that they were injured." *Id.*

In the first place, Conrad must present common evidence that Jimmy John's and its franchisees "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). And because Conrad alleges a "hub-and-spokes conspiracy" (*see* Conrad's Mem. at 1–2), he must ultimately establish "both that there was a central coordinating party (the 'hub'), and that each participant (along the 'rim') recognized that it was part of the greater arrangement, and it coordinated or otherwise carried out its duties as part of the broader group," *Marion Healthcare, LLC v. Becton Dickenson & Co.*, 952 F.3d 832, 842 (7th Cir. 2020). "In other words, a 'hub-and-spokes conspiracy' requires a 'rim' connecting the various horizontal agreements." *Id.* "[F]or such a conspiracy to exist, 'those people who form the wheel's spokes must have been aware of each other and must do something in furtherance of some single, illegal enterprise.'" *United States v. Bustamante*, 493 F.3d 879, 886–87 (7th Cir. 2007) (quoting *United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977)); *see also MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844 (5th Cir. 2015) (noting that the antitrust plaintiff must show that the spokes "knew the essential nature and general scope of the joint plan") (cleaned up). "[A] rimless wheel conspiracy," on the other hand, "is not a single, general conspiracy but instead amounts to multiple conspiracies between

the common defendant and each of the other defendants." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) (citing *Kotteakos v. United States*, 328 U.S. 750, 768–69 (1946)). So in the end, "to secure class certification," Conrad must "demonstrate (not merely allege) that there is proof common to all class members, and that this proof would show that they suffered 'injuries that reflected the anticompetitive effect of either the violation or the anticompetitive acts made possible by the violation.'" *Kleen Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 926 (7th Cir. 2016) (quoting *James Cap & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 399 (7th Cir. 2006)).

The predominance requirement is not satisfied here because, among other reasons, Conrad failed to establish that common evidence will show that the Jimmy John's franchisees had a conscious commitment to suppress labor mobility. Given that the No-Poach Provision was independently enforced (Jimmy John's itself having no hand), some franchisees took no part in doing so. For example, one franchisee suggested that he does not enforce the Provision because "employees are allowed to work wherever they want." (Jimmy John's Franchisee Forum Post from December 2017, Jimmy John's Resp. at Ex.133-19). Another posited, "Who really enforced that in their units? I'm not going to track where each employee goes to work at next." (Jimmy John's Franchisee Forum Post from July 2018, Jimmy John's Resp. at Ex. 45). (*See also* McNulty Decl. ¶ 33, Jimmy John's Resp. at Ex. 133-69) (franchisee hired manager after receiving verbal consent from previous franchisee-employer). Some also thought that the Provision only applied to managers—possibly because some versions of the Provision *did* only apply to managers. (*E.g.*, Email from Franchisee to Jimmy John's from August 2014, Jimmy John's Resp. at Ex. 133-14).

These franchisees surely are not alone in their practice of not enforcing the Provision, permitting employees to change locations without exercising their right of enforcement. Indeed, Jimmy John's expert, Dr. McCrary, determined that 88 percent of releases—when requested at all—were granted. (McCrary Report ¶ 87, Jimmy John's Resp. at Ex. 133-57). While the evidence so far suggests that other franchisees did, in fact, enforce the Provision (*e.g.*, Jimmy John's Franchisee Forum Post from December 2017) ("[W]e were already sued last year for this."), that only highlights the individualized nature of Conrad's claims. *See United States v. Townsend*, 924 F.2d 1385, 1391 (7th Cir. 1991) ("[M]ere knowledge of the hub's activities, or those of the other spokes, is not enough to tie the conspiracy together.").

Although "[t]here have been many antitrust class actions in which the relief sought was damages, and the fact that the damages would generally be different for each member of the class was not deemed an insuperable obstacle," *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir. 1994), separate proof would be needed to establish which franchisees, if any, consciously acted to further the unlawful objective of suppressing labor mobility. Along those lines, though "[t]he justification for cooperation is not relevant to whether that cooperation is concerted or independent action," *id.* at 199, the circumstances must still reveal "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement," *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946). No such evidence exists here. In sum, Conrad has not shown that common evidence will establish that each (or even most) of the franchisees conspired with Jimmy John's in the common pursuit of suppressing labor mobility.

Individual inquiries also arise from the changing face of the No-Poach Provision. True, each of the nearly 800 franchisees signed a franchise agreement containing some form of the Provision. But Conrad claims that there was a "standard franchise agreement." (Am. Compl. at 9). Not so. In 2014, for example, the No-Poach Provision prohibited franchisees from **hiring** *managers* who had worked for another franchisee within the past two years. In 2015, that prohibition was removed; from then on, franchisees were simply not allowed to **solicit** other franchisee's *workers*. While Conrad contends that most franchisees were governed by a similar version of the Provision found in the 2014 Franchise Agreement (Conrad's Mem. at 8–9), the agreements expired every 10 years (*see, e.g.*, 2007 Franchise Agreement § 1(D), Doc. 133-3; 2015 Franchise Agreement § 1(D); 2016 Franchise Agreement § 1(D)). In other words, the class members "'held a multitude of jobs, at different levels of [Jimmy John's] hierarchy, for variable lengths of time, in [3,000] stores, sprinkled across [40] states,'" with each franchisee having its own philosophy on enforcing the No-Poach Provision, "subject to a variety of [agreements] that all differed . . . .'" *See Dukes*, 564 U.S. at 360 (quoting *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 652 (9th Cir. 2010) (Kozinski, C.J., dissenting)). Proof of impact would thus vary among class members depending on their position and which version of the Franchise Agreement they were governed by. Similarly, given that Conrad seeks to certify a class of all Jimmy John's employees from 2014 to 2018 whose franchisees signed different agreements, overwhelming individualized inquiries would be required to establish that each franchisee participated in the same "conspiracy."

The Court also excluded Dr. Singer's testimony because he used a flawed methodology to predict antitrust impact. More specifically, the Court determined that Dr. Singer's regression models suffered from a systemic failure to adjust for those two percent of the wage data that did not consistently record employee wages as per-shift or per-hour, leading to inflated estimates of impact. Fatally, Conrad relies only on Dr. Singer's report to support his claim that the wages of every Jimmy John's employee nationwide were suppressed by the No-Poach Provision. On the other hand, the Court admitted the testimony of Dr. Ordover, Jimmy John's expert, who ably demonstrated that—after adjusting for Dr. Singer's error—"managers paid on an hourly basis had an average wage suppression of approximately two percent, while salaried managers suffered no suppression at all." (Ordover Report at 21, Jimmy John's Resp. at Ex. 133-67). "Without presenting another methodology, [Conrad] cannot show Rule 23(b)(3) predominance: Questions of individual damages calculations will inevitably overwhelm questions common to the class." *See Comcast Corp.*, 569 U.S. at 34.

Additionally, the United States Supreme Court recently concluded in *NCAA v. Alston* that the plaintiff's monopsony claims were appropriately analyzed under the rule of reason, not the per se rule. 141 S. Ct. 2141, 2157 (2021). In brief, a class of current and former student-athletes sued the NCAA and 11 Division I conferences for using their "monopsony power to cap artificially the compensation offered to recruits." *Id.* at 2152 (cleaned up). Even though the defendants *admitted* that their conduct constituted "horizontal price fixing in a market where [they] exercise monopoly control" *id.* at 2154, the Court took "special care not to deploy" the per se rule given the "often hard-to-see

efficiencies attendant to complex business arrangements," *id.* at 2156. *Cf. Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984) ("[A] per-se rule is applied when 'the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'") (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20 (1979)). Rather, the Supreme Court agreed with the district court's finding that the "fuller review" offered by the rule of reason was more appropriate in a monopsony case involving "an industry in which some horizontal restraints on competition are essential if the product is to be available at all." *Alston*, 141 S. Ct. at 2157 (cleaned up); *see also id.* at 2158 ("Whether an antitrust violation exists necessarily depends on a careful analysis of market realities.").

*Alston* thus answers a question this Court punted at the motion-to-dismiss stage: The rule of reason applies in this monopsony case challenging a nationwide franchise's use of intrabrand restraints that were arguably "designed to help [the company] more effectively compete with other brands by ensuring cooperation and collegiality among franchisees, and by encouraging investment in training." (Jimmy John's Resp. at 5). *See also* United States' Statement of Interest, *Stigar v. Dough, Inc.*, No. 2:18-CV-00244-SAB, Doc. 30, at 11–16 (E.D. Wash. Mar. 7, 2019) (arguing that no-poach provisions in franchise agreements are subject to the rule of reason).

With that in mind, the rule of reason raises more individualized issues precluding class certification. "Especially in view of the increasing complexity of corporate operations, a business enterprise should be free to structure itself in ways that serve efficiency of control, economy of operations, and other factors dictated by business

judgment without increasing its exposure to antitrust liability." *Copperweld Corp.*, 467 U.S. at 773. To that end, "even under the best of circumstances, applying the antitrust laws can be difficult—and mistaken condemnations of legitimate business arrangements are especially costly, because they chill the very procompetitive conduct the antitrust laws are designed to protect." *Alston*, 141 S. Ct. at 2161. Indeed, "[t]he whole point of the rule of reason is to furnish 'an enquiry meet for the case, looking into the circumstances, details, and logic of a restraint' to ensure that it unduly harms competition before a court declares it unlawful." *Id.* at 2160 (quoting *Cal. Dental Ass'n v.* FTC, 526 U.S. 756, 781 (1999)); *see also id.* at 2164 ("[A]ntitrust courts must give wide berth to business judgments before finding liability."); Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 15 (1984) ("For a number of reasons, errors on the side of excusing questionable practices are preferable.").

Here, Jimmy John's expert Dr. McCrary persuasively described how most putative class members likely *benefited* from the No-Poach Provision because it gave franchisees an added incentive to provide more training, thus promoting employee advancement. (McCrary Report ¶¶ 96–98). For example, the Senior Director of Marketing Execution and Operations refused to release one certified manager because the franchisee "invested a lot of time and money in training him and getting him certified": The No-Poach Provision protected the investment franchisees made in training their employees. (Email from Buergler to Hooper at 1, Doc. 133-20) (emphasis added). Similarly, the Director of Franchise Development understood the Provision as a means "to keep the peace among franchisees," thereby "reduc[ing] friction within the system." (Morena Dep. at 12:16–18,

Doc. 133-53). In other words, the No-Poach Provision not only had the potential to encourage investment in training, but it may also have promoted cooperation between franchisees, increasing coordination and thus "increasing the overall demand for the brand." (McCrary Report ¶ 153; *see id.* § 6.2). (*See also* Hooper Dep. at 87:12–15) ("I think that the brand is stronger when [franchisees support each other] instead of bickering and squabbling over stuff that is external to serving customers freaky fast."). Perhaps more importantly, Dr. McCrary suggests that increasing the use of certified managers "improves the speed at which orders are executed and the frequency of complaints with the store." (McCrary Report ¶ 147; *see id.* § 6.1). These procompetitive justifications, coupled with the fact that most release requests were *approved* without conditions, present overwhelming individualized questions precluding certification. *See Kohen v. Pac. Inv. Mgmt. Co. LLC.*, 571 F.3d 672, 677 (7th Cir. 2009) ("[A] class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant . . . .").

Along those lines, the Court noted in excluding Dr. Singer's testimony that Conrad's baseline premise—that every Jimmy John's employee nationwide was injured by the No-Poach Provision, no matter their position or location—was mere *ipse dixit*. Indeed, "[c]ommon proof of actual injury to each class member requires that all class members operate in the same relevant market, otherwise, they could not be affected in a common manner by the challenged conduct." *Exhaust Unlimited, Inc.*, 223 F.R.D. at 513. And "[i]t is by now well established that any rule of reason analysis requires a showing of anticompetitive market effect. To hold otherwise would ignore the very purpose of the

antitrust laws which were enacted for the protection of competition, not competitors." *Lektro-Vend Corp. v. Vendo Corp.*, 660 F.2d 255, 268 (7th Cir. 1981) (applying the rule of reason to noncompetition covenant).

With that in mind, the Court remains of the same mind as Dr. Ordover and Dr. McCrary, whose prudent analyses revealed that the relevant labor market includes not merely Jimmy John's franchisees but also other quick-service restaurants ("QSRs"). Dr. Ordover recognized, for example, that "it is likely that the putative class members seek employment in a labor market (or multiple labor market) that is (or are) much broader than Jimmy John's branded stores." (Ordover Report ¶ 91). He then aptly demonstrated that "99 percent of Jimmy John's branded stores have at least ten other QSR brands within ten miles, with an average number of nearby brands of 53" (*id.* ¶ 103), and "an average number of QSR locations of nearly 257" (*id.* ¶ 104).

Similarly, given that "[s]ome franchisees indicate that they compete with all other employers in the local area hiring minimum wage employees," Dr. McCrary explained how "the only way an individual worker's wage could be suppressed by the [No-Poach Provision] is if the worker had developed specific skills at Jimmy John's that raised their productivity at Jimmy John's more than at other competing brands. If not, then competition from other brands would push the worker's wage at Jimmy John's up to the competitive level associated with that worker's skills." (McCrary Report ¶ 93). Without reaching the merits on that question here, individualized inquiries would still be needed to determine whether a given Jimmy John's employee could have been injured given the varied and dynamic labor markets across the country. In sum, the Court agrees with

Jimmy John's that Conrad's "failure to offer classwide evidence of a relevant labor market is case-ending." (Jimmy John's Resp. at 22).

### i. Superiority

"Rule 23(b)(3) also conditions class certification on whether the class action device is superior to other available methods for fairly and efficiently resolving the dispute in question." *Messner*, 669 F.3d at 814 n.5. Relevant considerations include:

> (A) The class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) The extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) The likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

The superiority requirement is satisfied when "a class action would achieve economies of time, effort, and expense and promote . . . uniformity of decisions as to persons similarly situated, without sacrificing procedural unfairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615. Indeed, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 388, 344 (7th Cir. 1997)). "But when a separate evidentiary hearing is required for each class member's claim, the

aggregate expense may, if each claim is very small, swamp the benefits of class-action treatment." *Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047 (7th Cir. 2007).

Jimmy John's argues that the superiority argument is not satisfied because the individualized questions discussed above—and more like them—would make a trial unmanageable:

> For instance, for any given class member, it would first be necessary to identify her employer and determine if they were aware of Section 7(d), and, if so, whether they enforced or ignored it. What were that franchisee's practices with respect to hiring, pay, and retention of employees—e.g., did the franchisee pay more than other QSRs in the area, or pay more at one of its Jimmy John's stores than others? Did the class member work for only a few weeks before quitting—and if so, could a reasonable factfinder still conclude that she would have received a promotion or raise but-for 7(d)? For a longer-tenured class member, did he receive a promotion, bonus, or raise? Did he move between stores—if so, did he do it for increased pay, or did he accept lower pay for other perceived advantages, such as proximity to his home? Were there any other separately-owned Jimmy John's stores within a reasonable commute of the class member's store? Was she an in-shopper or a manager—if the latter, what was her role in setting pay for other class members? Did she keep wages low in order to increase her own bonus?

(Jimmy John's Resp. at 30).

The Court agrees. Conrad characterizes these assertions as a "fiction that [he] is unable to quantify the wage suppression of each Class Member attributable to the restraint." (Conrad's Reply at 14). But Jimmy John's contentions go beyond mere difficulties in assessing individual damages. *See Mullins v. Direct Digit., LLC*, 795 F.3d 654, 663 (7th Cir. 2015) ("It has long been recognized that the need for individual damages

determinations at this later stage of the litigation does not itself justify the denial of certification.").

True enough, individual actions for suppressed wages may ultimately prove impractical, prohibitively expensive, or inefficient. Even so, a class action is hardly desirable when predominance is so lacking. *See Messner*, 669 F.3d at 814 n.5 (citing *Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004) ("Superiority analysis is intertwined with predominance analysis; when there are no predominant common issues of law or fact, class treatment would be either singularly inefficient or unjust.") (cleaned up)).

The issue is not simply one of assessing individual damages—rather, it is one where "it is apparent that [the class] contains a great many persons who have suffered no injury" and "thus require more than a thousand separate hearings" to assess the validity of each claim. *See Kohen*, 571 F.3d at 677. For example, the Court described above how the No-Poach Provision changed over time; how enforcement practices differed among franchisees; and how most class members—including Conrad—were never actually denied the chance to change shops, either because the franchisees acquiesced or because they did not seek a move in the first place. In the end, a class action is not superior to individual suits when the class is "defined so broadly as to include many members who could not bring a valid claim even under the best of circumstances." *See Messner*, 669 F.3d at 824. Thus the superiority requirement, too, is unsatisfied.

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Conrad's Motion to Strike

(Doc. 186) and Motion for Class Certification (Doc. 113).

**IT IS SO ORDERED.**

**DATED: July 23, 2021**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**